Case No. 15-17381

# In the United States Court of Appeal
# For the Ninth Circuit

## SAN FRANCISCO APARTMENT ASSOCIATION, COALITION FOR BETTER HOUSING, SMALL PROPERTY OWNERS OF SAN FRANCISCO INSTITUTE, SAN FRANCISCO ASSOCIATION OF REALTORS; and NORMAN T. LARSON

*Plaintiffs - Appellants,*

*v.*

## CITY & COUNTY OF SAN FRANCISCO, and DOES 1-20,

*Defendants – Appellees.*
_____

# APPELLANTS' REPLY BRIEF
_____

On Appeal from the United States District Court
for the Northern District of California
The Honorable Phyllis J. Hamilton, Presiding
District Court Case No. 4:15-cv-01545-PJH

NIELSEN MERKSAMER
PARRINELLO GROSS & LEONI LLP
James R. Parrinello (SBN 63415)
Christopher E. Skinnell (SBN 227093)
James W. Carson (SBN 287001)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Tel: (415) 389-6800
Fax: (415) 388-6874
*Attorneys for Plaintiffs - Appellants*

# **RECORD CITATIONS**

The following abbreviations are used in citations to the Record throughout this Brief:

"PER": Plaintiff's Excerpts of Record, filed herewith pursuant to 9th Circuit Rule 30-1. Citations to the Excerpts are in the form "(PER[Page#]-[Page#].)"

"DSER": Defendant's Supplemental Excerpts of Record, filed July 13, 2016. Citations to the Supplemental Excerpts are in the form "(DSER[Page#]-[Page#].)"

"Dkt.": Citations to individual entries on the docket of the district court in this case that are not included in Plaintiffs' Excerpts of Record or the Defendant's Supplemental Excerpts of Record. Citations to the record are in the form "(Dkt. #[Page#].)."

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................................................................1

II. THE CITY'S DENIAL THAT THE "GAG RULE" EXISTS AND EFFECTIVELY GIVES TENANTS A VETO ON LANDLORDS' SPEECH IS SPECIOUS, BUT THE FACT THE CITY FEELS COMPELLED TO DENY IT HIGHLIGHTS THE CONSTITUTIONAL DEFECTS OF THE ORDINANCE AS WRITTEN ........................................ 6

    A.    The City's Proposed Interpretation Of The Ordinance Cannot Be Squared With The Natural Meaning Of The Text ........................................................................ 6

    B.    Even If This Court Were To Accept The City's Interpretation—That Landlords Could Obtain The Tenant's Signature Later—It Would Not Be Constitutional To Force Landlords To Gamble That They Could Legalize Their Speech After The Fact ....................12

    C.    The City Makes No Effort To Deny That A "Gag Rule" Would Be Unconstitutional ........................................14

        1.    The City's protracted defense of the so-called "Notification Provision" (which Appellants have not challenged) is a red herring, plainly designed to distract the Court from the City's complete failure to defend the constitutionality of the Gag Rule (which Appellants *have* challenged) ........................................................14

        2.    The district court erred in failing to apply sufficiently rigorous scrutiny to the Ordinance ...............15

        3.    Even applying the "intermediate" *Central Hudson* analysis that the district court applied, the district court erred in upholding the Ordinance as a matter of law ............................................17

ii

[a]    The Gag Rule restricts speech regarding lawful activity ...........................................17

[b]    The City cannot rely solely on unspecified anecdotes to meet its burden of demonstrating that the Gag Rule addresses non-speculative problems ....................17

[c]    The City's reliance on unspecified anecdotes is also insufficient to carry its burden of showing that the Gag Rule would alleviate the supposed harms to a material degree.........................................19

[d]    The "gag rule" restricts speech more extensively than necessary ...................... 20

III.    THE ORDINANCE'S REQUIREMENT THAT LANDLORDS PROVIDE TENANTS WITH THE NAMES AND CONTACT INFORMATION OF ADVERSARIAL "TENANTS' RIGHTS" ADVOCATES IS UNCONSTITUTIONAL FORCED SPEECH ........................................21

IV.    THE ORDINANCE VIOLATES LANDLORDS' PRIVACY ................. 24

V.    THE ORDINANCE VIOLATES EQUAL PROTECTION AND DUE PROCESS BY SUBJECTING THE FUNDAMENTAL RIGHTS OF ONE PARTY TO A BILATERAL CONTRACT—LANDLORDS—TO UNIQUE BURDENS THAT ARE NOT PLACED ON THE OTHER PARTY ...................................................................... 28

VI.    THE ORDINANCE ARBITRARILY PENALIZES LANDLORDS (AND TENANTS) WHO CONTRACT FOR LAWFUL PURPOSES .........................................................31

VII.    CONCLUSION .................................................. 34

CERTIFICATE OF COMPLIANCE............................................. 35

PROOF OF SERVICE ................................................................. 36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baba v. Bd. of Supervisors,*
    124 Cal. App. 4th 504 (2004) ..........................................................*passim*

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,*
    447 U.S. 557 (1980) ..........................................................*passim*

*Chula Vista Citizens for Jobs & Fair Competition v. Norris,*
    782 F.3d 520 (9th Cir. 2015) (en banc) ................................... 23

*Davis v. Leal,*
    43 F. Supp. 2d 1102 (E.D. Cal. 1999) ...................................... 25

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ................................................................18

*Fisher v. Berkeley,*
    475 U.S. 260 (1986) ................................................................31

*Fla. Bar v. Went for It,*
    515 U.S. 618 (1995) ................................................................18

*H & M Assoc. v. City of El Centro,*
    109 Cal. App. 3d 399 (1980) ............................................. 25, 26

*Hill v. National Collegiate Athletic Assn.,*
    7 Cal. 4th 1 (1994) ............................................................ 29, 30

*Kaufman v. ACS Systems, Inc.,*
    110 Cal. App. 4th 886 (2003) .................................................16

*Larson v. City and County of San Francisco,*
    192 Cal. App. 4th 1263 (2011) ..........................................*passim*

*Lochner v. New York,*
    198 U.S. 45 (1905).............................................................31, 32

*Long Beach City Employees Ass'n v. City of Long Beach,*
    41 Cal. 3d 937 (1986) ........................................................ 29, 30

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) .................................................................................19

*Pac. Bell Tel. Co. v. Cal. Pub. Util. Comm'n*,
  621 F.3d 836 (9th Cir. 2010) ...............................................................9, 10

*Pac. Frontier v. Pleasant Grove City*,
  414 F.3d 1221 (10th Cir. 2005) .............................................................18

*Pacific Gas & Electric Co. v. Public Utilities Comm'n*,
  475 U.S. 1 (1986) ....................................................................................... 22

*Planned Parenthood v. Casey*,
  505 U.S. 833 (1992) .................................................................................. 32

*Pototsky v. United States Border Patrol*,
  2015 U.S. Dist. LEXIS 124361 (D. Ariz. Sept. 17, 2015) ...........................13

*Retail Digital Network, LLC v. Appelsmith*,
  810 F.3d 638 (9th Cir. 2016) ...........................................................*passim*

*Safelite Group v. Jepsen*,
  764 F.3d 258 (2d Cir. 2014)..................................................................... 23

*San Gabriel Tribune v. Superior Court*,
  143 Cal. App. 3d 762 (1983)..................................................................... 27

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013)................................................................... 20

*West Coast Hotel Co. v. Parrish*,
  300 U.S. 379 (1937) ................................................................................ 32

*Western States Med. Ctr. v. Shalala*,
  238 F.3d 1090 (9th Cir. 2001) .................................................................18

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985).........................................................................*passim*

## Constitutional Authorities

U.S. CONST. amend. I (free speech) ...................................................*passim*

U.S. CONST. amend. XIV (equal protection & due process) .............*passim*

## Statutes

Cal. Bus. & Prof. Code § 10240 ................................................. 11

Cal. Educ. Code § 48982(a) ...................................................... 11

Cal. Educ. Code § 49475(a)...................................................... 11

Cal. Gov't Code § 6254(n) ........................................................ 27

Cal. Gov't Code § 7060.4(a) ..................................................... 27

Ellis Act (Cal. Gov't Code § 7060 *et seq.*) ............................... 27

N.Y. Lab. Law § 195................................................................. 11

San Francisco Ordinance No. 225-14 ("Buyout Ordinance") ..........*passim*

§ 37.9E(a) .............................................................................18

§ 37.9E(c) ...........................................................................2, 7

§ 37.9E(d) ............................................................................ 6

§ 37.9E(e)(4) .......................................................................10

§ 37.9E(h) ........................................................................... 24

§ 37.9E(i) ............................................................................ 24

§ 37.9E(k) ............................................................................12

§ 37.9E(k)(1)......................................................................6, 7

§ 37.9E(k)(3) ......................................................................6, 7

§ 37.9E(h) ........................................................................... 24

San Francisco Rent Ordinance ............................................................... 7, 16

S.F. Admin. Code § 37.10B(a)(5) .............................................................. 20

S.F. Admin. Code § 37.10B(a)(6) .............................................................. 20

S.F. Subdivision Code §§ 1380-1397 ........................................................ 33

# I.

## <u>INTRODUCTION</u>.

The Ordinance is the latest attempt by San Francisco to hamstring landlords' ability to engage in discussions with their tenants regarding the ongoing terms of the landlord-tenant relationship. The City, by law, compels landlords to maintain that relationship in most circumstances, at the complete discretion of the tenant, and now it wishes to preclude landlords from discussing with their tenants a *voluntary* agreement to terminate the arrangement. The City's previous efforts in this vein have been rejected by California appeals courts, in *Larson v. City and County of San Francisco*, 192 Cal. App. 4th 1263, 1291-96 (2011) ("*Larson*"), and *Baba v. Bd. of Supervisors*, 124 Cal. App. 4th 504 (2004) ("*Baba*"). State courts are most familiar with the intricacies of the landlord-tenant relationship, yet the City removed this case in the hope of bypassing binding state court precedents. This Court should not permit the City's opportunistic forum-shopping to alter the result here.

The Ordinance violates landlords' fundamental free speech rights based on the content of the speech, by imposing a "Gag Rule" on landlords. The Ordinance provides that "[p]rior to commencing" any oral or written discussion regarding the possibility of entering into a buyout agreement a

1

landlord must serve the tenant with a three-page City "disclosure" form, and the tenant must sign the form and return it to the landlord.[1] Failure to comply with this requirement subjects landlords to severe penalties. By thus conditioning a landlords' ability to commence buyout negotiations upon receipt of the tenants' signatures, the City effectively gives tenants a veto over landlord speech—something the Court of Appeal in *Larson* already held to be unconstitutional in a unanimous, published decision binding the City.

Tellingly, the City makes no attempt to justify this "Gag Rule" under any standard of review, be it strict scrutiny, the intermediate scrutiny applicable to routine commercial speech under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ("*Central Hudson*"), or the "heightened" scrutiny applicable to content-based commercial speech restrictions under *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638 (9th Cir. 2016) ("*Retail Digital*"). Nor could it—the Gag Rule is unconstitutional regardless of the standard applied.[2]

Even the City acknowledges that regular *Central Hudson* "intermediate scrutiny" is inapplicable. (*See* Appellee's Answering Brief

---

[1] Ordinance § 37.9E(c) (PER114) (emphasis added).
[2] Curiously, the City spends pages of its brief defending the constitutionality of separate provision of the Ordinance that Appellants have not challenged.

["AAB"], pp. 12 & 25.) Though it disagrees with Appellants that strict scrutiny applies, the City accepts that—at least—the heightened scrutiny of *Retail Digital* controls. (*See* AAB, p. 12.) This is a fatal concession. Because the district court failed to apply the correct level of scrutiny, the decision below must be overruled.

Instead, the City claims the Gag Rule does not exist—that the Ordinance gives landlords the option of initiating buyout negotiations first and getting tenant consent later. That far-fetched interpretation is inconsistent with a natural reading of the Ordinance itself, however. Nor would it answer the constitutional objection if it were accepted. Forcing landlords to "roll the dice" on having their speech retroactively validated by tenants—at the risk of severe penalties if it is not validated—is untenable. At best, such a scenario creates an unconstitutional chilling effect on landlord speech.

Regarding the Ordinance's requirement that landlords present tenants with a City-prepared form containing contact information for "tenants' rights" groups hostile to landlords, the City is wrong that the requirement is subject only to rational basis review under *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626 (1985).

First, it ignores the fact that *Zauderer* is limited to the context of pure

3

commercial speech, whereas California's courts have recognized that the landlord-tenant relationship differs in material ways from the traditional context in which the commercial speech doctrine has been applied: in the routine sale of products and services.

Second, *Zauderer* only permits the government to require disclosure of "purely factual and uncontroversial information" to consumers; it does not permit the government to require a private speaker to advertise for interests hostile to those of the speaker in question, as here. The City responds that merely providing names and contact information is not a "hostile message," but this Court has recognized that in many cases the name of an organization effectively is the message. In this case, simply referring to them as "tenants' rights" organizations telegraphs the need for tenants to distrust landlords, as does the names of some of the specific organizations listed.

Finally, the compulsion for landlords to provide those names must also be considered in connection with the City's restriction on the ability of landlords to speak themselves, until they obtain the tenants' signatures on the form containing the "tenants' rights organizations"' names.

Additionally, the Ordinance:

(1)     collects landlords' sensitive financial information and makes it available to any person who is interested in seeing it, in violation of landlords' constitutional right of privacy;

(2)     violates equal protection by imposing differential treatment with respect to the exercise of fundamental rights, both by restricting landlords' speech but not tenants and by protecting tenants' sensitive financial information through redaction, while making landlords' financial information broadly public; and

(3)     irrationally interferes with landlords' and tenants' right to enter lawful buyout agreements, arbitrarily penalizing landlords for exercising their constitutional contract rights by forbidding those landlords to engage in condominium conversions, even when they have fully complied with the Ordinance.

The district court erred in holding that the City could enforce the Ordinance despite the foregoing constitutional defects, and especially in doing so as a matter of law, without giving Appellants the right to develop a factual record.[3]

---

[3] The City argues that Appellants have "waived" the argument that they should have been entitled to establish a record on a number of points, because the argument purportedly was not raised in the trial court. (*See* AAB, pp. 18 & 29 n.14.) This contention is frivolous. Opposing judgment on the

The district court's order granting judgment on the pleadings should be OVERRULED.

## II.

### THE CITY'S DENIAL THAT THE "GAG RULE" EXISTS AND EFFECTIVELY GIVES TENANTS A VETO ON LANDLORDS' SPEECH IS SPECIOUS, BUT THE FACT THE CITY FEELS COMPELLED TO DENY IT HIGHLIGHTS THE CONSTITUTIONAL DEFECTS OF THE ORDINANCE AS WRITTEN.

**A.    The City's Proposed Interpretation Of The Ordinance Cannot Be Squared With The Natural Meaning Of The Text.**

The language of the Ordinance is plain. It reads (in relevant part):

> ***Prior to commencing Buyout Negotiations*** for a rental unit, ***the landlord shall provide each tenant in that rental unit a written disclosure***, on a form developed and authorized by the Rent Board, ***that shall include*** the following: ... (10) ***A space for each tenant to sign and write the date the landlord provided the tenant with the disclosure***. [¶] The landlord shall retain a copy of each ***signed*** disclosure form for five years, along with a record of the date the landlord provided the disclosure to each tenant."

Ordinance § 37.9E(d) (PER115) (emphasis added).

Failure to comply with these requirements subjects the landlord to civil actions, monetary awards, and liability for attorneys' fee awards for up to four years following the entry of a buyout agreement. Ordinance §

---

pleadings inherently constitutes an argument that development of a record—rather than resolution as a matter of law—is appropriate.

6

37.9E(k)(1) & (3) (PER119). Specifically, the Ordinance provides, "The landlord shall be liable for the tenant's damages. In addition, the penalty for violation of subsection (d) shall be up to $500 ...The court shall award reasonable attorneys' fees to any tenant who is the prevailing party in a civil action brought under this subsection." (*Id.*) Thus, a landlord could face a civil action for several years' worth of a tenant's rent differential, dating to the time of the tenants' vacating the premises; plus $500; plus an award of attorneys' fees, and it could face such a claim from multiple tenants per unit.

By requiring the landlord to obtain a "signed disclosure form" from each tenant "[p]rior to commencing Buyout Negotiations"—which are broadly defined as "any discussion or bargaining, whether oral or written, between a landlord and tenant regarding *the possibility* of entering into a Buyout Agreement"[4]—the Ordinance effectively gives the tenant a veto over the landlord's speech, based on the content of that speech.

This is not the first time the City has tried to suppress landlords' ability to commence buyout negotiations, by giving tenants a veto over landlords' speech. *See Larson*, 192 Cal. App. 4th at 1291-96 (enjoining a provision of the Rent Ordinance prohibiting landlords from "[c]ontinu[ing] to offer payments to vacate after tenant has notified the landlord in writing [that]

---

[4] Ordinance § 37.9E(c) (PER114) (emphasis added).

they no longer wish to receive further offers of payments to vacate."). Nor is *Larson* the only time California's courts have recognized (and thwarted) the City's inclination to suppress landlords' speech. *See also Baba*, 124 Cal. App. 4th at 504. But now—as before—those efforts are unconstitutional, and the City's forum-shopping cannot change that fact. Landlords cannot be deprived of their right to discuss the possibility of entering a buyout agreement with their tenants.

The City does not deny that if the Ordinance is read according to its plain import, as imposing a gag rule on landlords' speech, that such rule would be unconstitutional. Nor could it, in light of *Larson.* Instead, the City pretends the gag rule doesn't exist, urging that nothing in the Ordinance requires the landlord to *first* obtain the tenant's signature. A landlord could always (according to the City) provide the disclosure form, initiate buyout negotiations, and hope to get the signature(s) later. But this is a tortured and implausible reading of the Ordinance itself, and the fact the City feels compelled to engage in such sleight-of-hand highlights the obvious unconstitutionality of the Ordinance as written.

The Ordinance (1) links the tenant's signature to the landlord's provision of the disclosure form, which must be done "[p]rior to commencing Buyout Negotiations" and (2) also requires the tenant to "write the date" the

landlord provided the disclosure—clearly evidencing an intent by the Ordinance's drafters that the signature be provided simultaneously. Further, the disclosure form created by the Rent Board advises:

> **Each tenant *must sign this three-page Pre-Buyout Negotiations Disclosure Form below and write the date the landlord provided the tenant with the disclosure form*. The landlord is <u>not</u> required to file a copy of the Disclosure Form with the Rent Board. The landlord is required to retain a copy of each signed Disclosure Form for five years, along with a record of the date the landlord provided the disclosure to each tenant**

(PER77; bold and underline in original, italics added.)

To read the language of the Ordinance and the Rent Board's own form as making the tenants' signature of the form anything but a prerequisite to further discussions of a buyout is to engage in a post-hoc rewriting of the Ordinance.

Which is what the City proposes this Court do.

The City urges this Court to disregard the natural meaning of the Ordinance on the theory that it leads to an "absurd" result. (AAB, pp. 22-23.) But this is an improper and overly-broad application of the "absurd results" canon, which only permits a court to ignore the language of a statute when "it would be 'patently inconceivable' that the [Supervisors] intended the result." *Pac. Bell Tel. Co. v. Cal. Pub. Util. Comm'n*, 621 F.3d 836, 848

(9th Cir. 2010) (quoting *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1098 (9th Cir. 2007)). In this case, "[i]t is perfectly conceivable the [Board] meant what it said when it" gave tenants the ability to restrict landlords' speech regarding possible buyout agreements, *id.*, since the City has tried to accomplish similar ends in the past, only to be rebuffed by state appellate courts.

The City also argues that Appellants' reading of the Ordinance's plain language ignores the purpose of the statute, which, the City maintains, is to "create a record that the disclosure was actually provided." (AAB, p. 19.) But there is nothing inconsistent between such a purported "purpose" and the need to obtain a tenant's signature before entering Buyout Negotiations. Even if the City's purpose were innocent, by adopting the Gag Rule it chose an unconstitutional means of accomplishing it. It is worth noting that other provisions of the Ordinance *already* serve the purpose of ensuring disclosure was actually provided. Ordinance § 37.9E(e)(4) requires that a landlord file a statement with the Rent Board (also prior to commencing buyout negotiations), signed *under penalty of perjury*, that the disclosures were provided to each tenant. (PER116.)[5]

---

[5] The City contends such mandatory signature requirements are common when disclosures are required in a private, rather than public context, citing a handful of statutes from California, New York and Ohio. (*See*

10

The City now argues (for the first time, as it made no such claim in the district court) that the Ordinance does not authorize tenants to file a claim against landlords for failure to obtain and retain a signed disclosure form. Here again, the plain language of the Ordinance says otherwise. Section 37.9E(k)(1) provides, in categorical terms, that "[a] tenant who has vacated a unit based on a Buyout Agreement may bring a civil action against the landlord in San Francisco Superior Court for failure to comply with the requirements set forth in subsections (d) and (f)." It makes no exception for "the requirement set forth in subsection (d)" that a landlord obtain and retain a signed disclosure form.

The City adopted an ordinance that—on its face—requires landlords to provide a disclosure form and get it signed by the tenant "[p]rior to commencing Buyout Negotiations"; requires the landlord to "retain a copy of each signed disclosure form for five years"; and authorizes tenants to seek severe penalties from landlords who fail to comply with these requirements.

---

AAB, p. 20.) But none of the California statutes, nor the New York statute, condition a party's speech on obtaining another party's signature in advance. *See* Cal. Bus. & Prof. Code § 10240 (signature required as part of executing loan agreement); Cal. Educ. Code § 49475(a) (signature required by student athlete's parents so student can participate in school activities); Cal. Educ. Code § 48982(a); N.Y. Lab. Law § 195 (notices provided to employees not a prerequisite to any subsequent action). The Ohio statute appears to be cited erroneously—neither that section nor any surrounding sections impose the obligation that City claims.

The City's attempts to re-write the Ordinance post-hoc, in an effort to save its constitutionality, are unavailing. Nor do the City's assurances—that "no court would read [the Ordinance] to mean" what it says—provide comfort. Idle predictions about a future court's interpretation of the Ordinance are meaningless, since a tenant who sought to bring such a suit would not be bound by the City's assurances in a lawsuit seeking a monetary award against an owner for violating the Ordinance. The City need not even be a party to that suit.

## B. Even If This Court Were To Accept The City's Interpretation—That Landlords Could Obtain The Tenant's Signature Later—It Would Not Be Constitutional To Force Landlords To Gamble That They Could Legalize Their Speech After The Fact.

In any event, even if the Court were to accept the City's strained interpretation—that, as a theoretical matter, a landlord can speak and take its chances with getting the tenant's signature later—that is still insufficient to answer the First Amendment concerns. The potential penalties for violating these requirements—including that the landlord obtain and keep a signed copy of the disclosure form—could be substantial.[6] No rational

---

[6] Under Ordinance § 37.9E(k), a tenant who has vacated pursuant to a buyout agreement can bring a civil action for violations of subsection (d), under which the landlord is liable for the tenant's damages plus a penalty up to $500 plus an award of attorneys' fees. (PER119.)

landlord would "roll the dice" in the manner suggested by the City—would choose to undertake buyout negotiations, faced with such dire consequences, without *first* obtaining the tenant's signature.

Nor can the City put landlords to such a choice. "In the context of the First Amendment, litigants are not required 'to speak first and take their chances with the consequences.'" *Pototsky v. United States Border Patrol*, 2015 U.S. Dist. LEXIS 124361, *6 (D. Ariz. Sept. 17, 2015) (quoting *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010)). By creating such a scenario, the Ordinance imposes an undeniable chilling effect on a landlord's speech— without obtaining a tenant's signature in advance, the landlord is forced, as a condition of speaking, to take the chance of subsequently becoming subject to the Ordinance's liability, penalty and attorney's fee provisions.

As this Court has held, "'the distinction between laws burdening and laws banning speech is but a matter of degree and that the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Retail Digital*, 810 F.3d at 651 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565-66 (2011)).

**C.    The City Makes No Effort To Deny That A "Gag Rule" Would Be Unconstitutional.**

**1.    The City's protracted defense of the so-called "Notification Provision" (which Appellants have not challenged) is a red herring, plainly designed to distract the Court from the City's complete failure to defend the constitutionality of the Gag Rule (which Appellants *have* challenged).**

The City devotes eight full pages to defending the constitutionality of the provision that it dubs the "Notification Provision"—a requirement that landlords inform the Rent Board of their intention to commence buyout negotiations. (*See* AAB, pp. 24-32.) Since Appellants have not challenged the so-called "Notification Provision," this extended defense should be understood for what it is—an effort to obscure the fact that the City makes no effort to defend the constitutionality of the provision *actually* challenged: the Gag Rule. This Court should not be distracted by the City's bait-and-switch.

It is in the context of defending *the unchallenged "Notification Provision"* that the City (1) argues against applying strict scrutiny; (2) defends reliance on anecdotal evidence as a basis for legislating; (3) and addresses the application of *Central Hudson*. But the City makes no effort to defend the Gag Rule under *any* level of scrutiny.

14

## 2. The district court erred in failing to apply sufficiently rigorous scrutiny to the Ordinance.

It is now undisputed that the district court failed to apply sufficiently rigorous constitutional scrutiny to the Ordinance. While the City disputes the contention that strict scrutiny applies, it admits that "this Court's recent decision in *Retail Digital* ... held that content-based restrictions on commercial speech receive 'heightened judicial scrutiny' under *Sorrell* ..." (AAB, p. 12.) The district court did not apply this heightened judicial scrutiny—which is a "more demanding" version of *Central Hudson* than the "intermediate scrutiny" applicable to content-neutral restrictions on commercial speech, *see Retail Digital*, 810 F.3d at 650-51. The Gag Rule cannot survive the application of that heightened scrutiny.

But the City and district court are also wrong that strict scrutiny does not apply. The City's reliance on the commercial speech doctrine ignores the unique context presented by landlord-tenant relationships, and the fact—remarked upon by the *Larson* court—that "It is also notable that the United States Supreme Court's commercial speech decisions have involved the advertising or sale of *products and services.*" 192 Cal. App. 4th at 1290 (emphasis in original).

15

*Larson* and *Baba* recognize that the landlord/tenant relationship is unlike the relationship between a normal merchant and consumer.[7] As *Larson* observed, in distinguishing cases upholding do-not-call lists, "the do-not-call registry is aimed at certain nameless and faceless telemarketers who make impersonal sales pitches to whoever happens to fit the demographic they are targeting. The landlord-tenant relationship is significantly different. The parties have a preexisting and ongoing relationship which 'surely has a commercial component,' but also is 'more complex, personal and permanent than the relationship between the seller of goods or services and his or her potential buyer.'" 192 Cal. App. 4th at 1294-95 (quoting *Baba,* 124 Cal. App. 4th at 516).[8]

The landlord/tenant relationship in San Francisco is also different from the normal commercial context in that, at least from the landlord's perspective, its ongoing nature is *compulsory*. The Rent Ordinance *compels* landlords to continue renting their units to a given tenant at specified rates

---

[7] These rulings deserve careful consideration, because (1) as a party to *Baba* and *Larson*, the City is bound by them, and (2) this Court and others recognize that state courts have greater expertise with respect to landlord-tenant relations than federal courts. (*See* AOB, p. 32 n.11 [citing cases].)

[8] *See Kaufman v. ACS Systems, Inc.*, 110 Cal. App. 4th 886, 911 (2003) (relying on exemption to the do-not-call list for merchants to "send advertisements to those with whom it or the advertiser has an established business relationship" in rejecting First Amendment challenge).

16

*indefinitely*, and the Ordinance seeks to restrict the landlord's ability to discuss the ongoing terms and duration of that compelled relationship.

### 3. Even applying the "intermediate" *Central Hudson* analysis that the district court applied, the district court erred in upholding the Ordinance as a matter of law.

Even if this Court were to conclude that the district court correctly applied the "intermediate" *Central Hudson* analysis[9] applicable to routine, content-neutral restrictions on commercial speech (which even the City acknowledges was not the proper standard, *see* AAB, p. 12)—the Gag Rule cannot stand.

[a]    The Gag Rule restricts speech regarding lawful activity. The City does not deny that buyout negotiations are speech concerning lawful activity and are not inherently misleading.

[b]    The City cannot rely solely on unspecified anecdotes to meet its burden of demonstrating that the Gag Rule addresses non-speculative problems. The City bears the burden of establishing that restrictions on speech serve a "substantial government interest," and the Supreme Court has held that "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its

---

[9] *See* the district court opinion characterizing it as "intermediate scrutiny" at PER14, lines 16-18; PER19, lines 7-8; & PER24 n.5.

17

restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). The City cannot deny that the Ordinance is legislation addressing a purely anecdotal problem—the legislation's Findings state as much.[10] Instead, the City contends that the Supreme Court sanctions reliance on anecdotal evidence as the sole basis for legislation restricting speech. That is false. The City cites no case that upheld restrictions on commercial speech (much less non-commercial speech) based solely on unspecified anecdotes.

Though the Court in *Fla. Bar v. Went for It*, 515 U.S. 618 (1995), commented that prior cases had upheld (non-speech) restrictions "based solely on history, consensus, and 'simple common sense,'" that decision did not rely on mere anecdotes and common sense, but a two-year study of the impact of lawyer advertising and solicitation. Multiple courts—including this one—have distinguished *Florida Bar* on that basis. *See Western States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1094 (9th Cir. 2001); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005); *see also Retail Digital*, 810 F.3d at 653 (rejecting "common-sense judgment of [the] lawmakers" who enacted the speech-restricting commercial statutes and remanding for development of record).

---

[10] *See* Ordinance § 37.9E(a) (PER113.)

Finally, in *Baba*, the state appeals court also rejected the City's reliance on purely anecdotal evidence as a basis for restricting landlords' speech, holding that the restrictions at issue in that case failed *Central Hudson*. *Baba*, 124 Cal. App. 4th at 520-21.

Here, there could be no such record evidence, because the district court granted the City judgment as a matter of law, though the City bears the burden of providing evidence to justify its speech restrictions. That alone was reversible error.

[c]     The City's reliance on unspecified anecdotes is also insufficient to carry its burden of showing that the Gag Rule would alleviate the supposed harms to a material degree. Even accepting, *arguendo*, that the interests identified are substantial, the City never demonstrates how the Gag Rule— an blanket ban on landlords' speech, temporary or not—directly advances them.

The City has the burden to show it satisfies the third step of *Central Hudson*, and this burden—like the requirement that the City identify a substantial interest—also "is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Lorillard*

19

*Tobacco Co. v. Reilly,* 533 U.S. 525, 555 (2001); *Baba,* 124 Cal. App. 4th at 520-21. The City failed to meet this latter burden in *Baba* as well, due to its reliance on purely anecdotal evidence. *Id.*

Because it pretends the gag rule does not exist, the City devotes all of its briefing to showing that *disclosures* could serve such purposes. But disclosures could be required (subject to the caveats in Section III), without prohibiting landlords from speaking to tenants about possible buyouts for an indefinite period of time.

[d]    The "gag rule" restricts speech more extensively than necessary. Finally, even accepting (for the sake of argument) that the City seeks to advance substantial interests and the Ordinance will address them to a material degree, the Gag Rule still restricts more speech than necessary.

As to intimidation and coercion, Proposition M already imposes stringent civil and criminal penalties on landlords engaging in such tactics. *See* S.F. Admin. Code § 37.10B(a)(5), (6); *see also Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 815 (9th Cir. 2013) (restriction on soliciting day labor that impeded traffic failed *Central Hudson* because, though Arizona had a substantial interest in traffic safety, its preexisting laws already proscribed traffic hazards without reference to protected speech).

As to tenants knowing their rights, that cannot justify giving tenants a complete veto over landlords' speech regarding potential buyout agreements. *See Larson*, 192 Cal. App. 4th at 1291-96 (striking down prior attempts to authorize tenants to veto landlords' speech regarding such agreements).

## III.

### THE ORDINANCE'S REQUIREMENT THAT LANDLORDS PROVIDE TENANTS WITH THE NAMES AND CONTACT INFORMATION OF ADVERSARIAL "TENANTS' RIGHTS" ADVOCATES IS UNCONSTITUTIONAL FORCED SPEECH.

The City continues to argue that the content of the disclosure statement that the landlord must serve on the tenant, and have signed before engaging in buyout negotiations, deserves rational basis review under *Zauderer*. That is incorrect. In particular, the requirement that landlords provide tenants with the names of so-called "tenants' rights" organizations violates the First Amendment.

First, *Zauderer* prescribes rational basis review for laws that require "purely factual and uncontroversial information" to be provided to consumers *in the context of pure commercial speech*. *Id.* at 651. As discussed above and in Appellants' Opening Brief—and recognized by the Court of

Appeal in *Baba* and *Larson*—the landlord-tenant relationship does not fit within the traditional commercial speech rubric.

Second, the compulsion to provide disclosures in this case—particularly contact information regarding adversarial tenants' rights organizations—must be viewed in conjunction with the Gag Rule. The City silences landlords so only its speech may be heard.

Finally, by forcing landlords to provide these names, the City *does* effectively associate the landlord with the compelled speech, giving the impression of an implicit endorsement of organizations that are inherently adversarial to landlord interests.[11] The Ordinance is like the requirement at issue in *Pacific Gas & Electric Co. v. Public Utilities Comm'n*, 475 U.S. 1 (1986), where the Court struck down a requirement that PG&E apportion space in its billing envelopes for inserts by a public consumer group hostile to PG&E.

The City seeks to distinguish *Pacific Gas & Electric* on the ground that a name and phone number, standing alone, purportedly cannot convey a "message," unlike the inserts at issue in *Pacific Gas & Electric*. But simply reviewing some of the names in question—Asian Americans *Advancing*

---

[11] Contact information for these organizations is already available on the Rent Board's web site.

22

*Justice*, *Housing Rights* Committee of SF, Causa Justa (*Just Cause*) undermines this premise, as does the fact they are called "*tenants' rights* organizations." (PER78.)

Moreover, this Court has recognized that often identity *is* message. Thus, an en banc panel held that the State could require initiative proponents' names to appear on an initiative petition, because "[k]nowing which interested parties back or oppose a ballot measure is critical…" *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 539-40 (9th Cir. 2015) (en banc). And the entire premise of campaign finance disclosure is that a speaker's identity is crucial to understanding the message.

Also instructive is *Safelite Group v. Jepsen*, 764 F.3d 258 (2d Cir. 2014). Connecticut adopted a statute that restricted insurers and claims administrators from mentioning the name of, or scheduling an appointment with, an affiliated glass company unless they also gave the name of a competing glass company in the area. The trial court upheld the law under *Zauderer*, concluding it was a factual disclosure subject to rational basis review. The Second Circuit reversed, holding that to require a commercial speaker to provide the name of its competitors required greater scrutiny than purely factual information about the speaker's own products. Likewise here,

23

requiring landlords to provide the name of adversarial "tenants' rights" organizations cannot claim the deferential review prescribed in *Zauderer*.

## IV.

## __THE ORDINANCE VIOLATES LANDLORDS' PRIVACY__.

Once a landlord and tenant enter a buyout agreement, the landlord must file a copy with the Rent Board. Ordinance § 37.9E(h) (PER118). The Board must create a searchable database with the information received from the filed agreements that is accessible to the public, *and which is required to include copies of every buyout agreement filed*. Ordinance § 37.9E(h) & (i) (PER118). Before posting any filing on its database, the Board must redact all information regarding the identity of tenants, but not the landlord. *Id.* This violates landlords' constitutional privacy rights.

The City would have this Court believe that the right of privacy is far narrower than it is—that only a small subset of business records, such as bank records, is protected, and that a business can have no reasonable expectation of privacy regarding day-to-day financial activities. That is not the case, especially in the circumstances presented here, where landlords' private financial information will be disseminated to the world, including on the Rent Board's website.

First, the right of privacy under California's Constitution includes the right of "financial privacy," which includes "not only bank records, but also documents generated in one's business affairs, e.g., contracts, business records and the like that have not received widespread dissemination, or have not been publicly filed." *Davis v. Leal*, 43 F. Supp. 2d 1102, 1111 (E.D. Cal. 1999). And while *Davis* speaks of business records that "have not been publicly filed," it is the requirement of public filing in this case that is at issue. Appellants object to the City's "widespread dissemination" of business records—specifically, contracts and other sensitive financial information—that have historically been private.

The City cannot defend its invasion of landlords' privacy by pointing to the "widespread dissemination" of historically-private buyout agreements, when that "widespread dissemination" is the City's doing. To hold otherwise would immunize public agencies from ever facing a claim that a legislative enactment could violate "financial privacy" by improperly compelling the disclosure of private information, and fly in the face of case law holding that the right of privacy is violated when the government improperly uses information "properly obtained," such as by disclosing it to third parties.

*H & M Assoc. v. City of El Centro*, 109 Cal. App. 3d 399 (1980), held that the improper public disclosure of a *landlord's* financial information

violated the Constitution's guarantee of privacy rights, even when the government originally obtained that information legitimately. *See id.* at 411 (overruling dismissal of landlord LLC's invasion of privacy claim against city manager for such disclosure). The City tries to distinguish *H & M Assoc.* on the ground that the consequence of disclosure in that case—making it more difficult for the landlord to pay his bills—is absent here. (*See* AAB, p. 36.) But that fact is pertinent to the nature of the cause of action and possible remedies, not the existence of the underlying privacy right. There is no merit to the implication that because this case seeks to proactively prevent invasion of landlords' privacy rights, rather than seeking to remedy such invasions post hoc (as was the case in *H&M*), somehow the privacy right does not exist.

Additionally, the assertion that the information made publicly-available under the Ordinance is no different than that made generally available does not hold up. For example, the City observes that summary information regarding the recordation of ownership interests in property, such as the name of the buyer and seller and the sale date, is available online. But such summary information does not equate to the sort of comprehensive disclosure of private information contemplated by the Ordinance. The breadth of the Ordinance's disclosure is more akin to requiring sellers of real

property to publicly record *the entire contract of sale*, rather than a mere deed.

The City also argues that more detailed financial records must often be provided by landlords to the Rent Board, and suggests—without any citation—that such records are "publicly accessible." (*See* AAB, p. 34.) Here again, a closer look reveals the truth. For example, the City claims such information must be submitted to the Rent Board by landlords "when they seek to withdraw residential units from the rental market under the Ellis Act." (*Id.*) But of course, the Ellis Act *itself* provides that key information, including "the rent applicable to any residential rental unit, or the total number of accommodations, *is confidential information*...," *see* Cal. Gov't Code § 7060.4(a), undermining the notion that landlords should be accustomed to having all of their private financial transactions made public. And, of course, in an Ellis Act eviction there is no consideration to disclose.

As to the claim that information supporting landlord petitions to the Rent Board is "publicly accessible," even assuming that is true,[12] the City has not suggested that information supporting tenant petitions is treated confidentially. In this case, by providing for the redaction of tenant

---

[12] *But see* Government Code § 6254(n); *San Gabriel Tribune v. Superior Court*, 143 Cal. App. 3d 762, 779 (1983).

information from buyout agreements, the City implicitly acknowledges that information contained in those agreements is qualitatively different.

Finally, the City argues its public disclosure of landlords' private financial information serves a valid public purpose. However, the district court rightly held such a justification is an affirmative defense, and not a basis for judgment on the pleadings. (PER36.)

## V.

## THE ORDINANCE VIOLATES EQUAL PROTECTION AND DUE PROCESS BY SUBJECTING THE FUNDAMENTAL RIGHTS OF ONE PARTY TO A BILATERAL CONTRACT—LANDLORDS—TO UNIQUE BURDENS THAT ARE NOT PLACED ON THE OTHER PARTY.

Though, as *Baba* and *Larson* recognized, landlords and tenants are engaged in ongoing, bilateral relationships, the Ordinance only restricts the landlords' speech, not tenants'. Tenants may, for example, initiate buyout negotiations without fear of sanction, and landlords cannot veto tenant speech, though a tenant also proposes a "financial transaction" in initiating buyout negotiations.[13] Tellingly, the City makes no effort to defend this differential limitation of landlords' speech—it simply disavows the differential treatment. (*See* Section II.A, *supra*.)

---

[13] Again, only landlords face penalties for violations of the Ordinance.

28

Likewise, the fact that the Ordinance requires redaction of tenants' sensitive financial information, but not landlords' sensitive and virtually identical financial information violates equal protection.

The City argues that because landlords are not a protected class, Appellants' equal protection claim is subject to rational basis review. (*See* AAB, p. 39.) However, that ignores the fact that *differential treatment* in connection with a fundamental right (like free speech or the constitutional right of privacy) triggers strict scrutiny. Thus, in *Long Beach City Employees Ass'n v. City of Long Beach,* 41 Cal. 3d 937 (1986), the California Supreme Court applied strict scrutiny in holding that a statute protecting private and public safety employees, but not other public employees, from having to submit to polygraph examinations as a condition of employment denied the complaining public employees equal protection. *Id.* at 956 (finding no "compelling state interest" in discriminating between public and private employees in allocation of privacy rights).

The City argues that the Court effectively overruled Long Beach's application of strict scrutiny, in *Hill v. National Collegiate Athletic Assn.*, 7 Cal. 4th 1 (1994), but that reads *Hill* too broadly. *Hill* did not purport to overrule *Long Beach*, and it held that whether to apply strict scrutiny or a less searching "balancing test" would depend on the circumstances of the

case. *Id.* at 34. Most crucially, *Hill* did not deal with a circumstance like *Long Beach*, in which equal protection was implicated by discrimination in the treatment of privacy interests.

The City nevertheless suggests that tenants should be treated differently with respect to their privacy rights, because (1) landlords have no reasonable expectation of privacy; (2) tenants have a "privacy interest in residential history" (AAB, p. 42); and (3) the differential treatment is rationally related to offsetting disparities in bargaining power. (*Id.*)

None of these claims holds water. The first is a meritless contention, discussed in Section IV above.

The second is an astounding premise, given the City's extended argument that already-public information cannot give rise to a privacy interest. After all, tenants must include their names and addresses on petitions to the Rent Board. That the City would even make this argument shows how much it is stretching to suggest that landlords have no reasonable expectation of privacy in their financial records. Moreover, if privacy of the home supports redacting tenant information, there is no explanation for subjecting a person who rents out a mother-in-law unit in the back of his or her home to broad public disclosure of financial and residential information.

30

Finally, the City suggests landlords have some vast informational advantage by virtue of owning (in some cases) multiple units. But, this is nothing more than an attempt—again—to paint a picture of a large, corporate landlord taking advantage of small-time, helpless tenants. This ignores the fact that many tenants are sophisticated and well-to-do, and many owners are mom-and-pop types whose life savings are invested in small rental property; moreover, even the largest landlords own only a small portion of the units in the City, and detailed discussion amongst them of buyout practices could implicate antitrust concerns. *Cf. Fisher v. Berkeley*, 475 U.S. 260, 266 (1986).[14]

## VI.

## THE ORDINANCE ARBITRARILY PENALIZES LANDLORDS (AND TENANTS) WHO CONTRACT FOR LAWFUL PURPOSES.

Despite the City's misguided attempt to smear Appellants' complaint as an attempt to revive *Lochner v. New York*, 198 U.S. 45 (1905), even it cannot deny that there remains a constitutional right to be free from

---

[14] The City asserts, "Appellants do not identify any purpose that would be served by including the tenant's name" in the database, implying there is no such purpose. (AAB, p. 43.) But if tenants benefit from knowing what buyout agreements their landlord has entered into, they would surely benefit from knowing which of their neighbors have entered such agreements.

arbitrary infringements on the exercise of constitutionally-grounded rights, including the right of contract. *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), which effectively overruled *Lochner*,[15] held laws dealing with "the regulation ... of private contracts .... [must] 'have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory...'" *Id.* at 398.

Punishing landlords who engage in voluntary buyout negotiations, and who comply with all of the protective procedural requirements therefor, by limiting their previously-existing property rights is an "arbitrary restraint" and not a "reasonable" regulation to safeguard the public interest.

The City identifies two purported governmental interests that are supposedly served by the condominium conversion ban: "protect[ing] tenants' interest in affordable rental housing by helping to maintain rental housing inventory, and protects vulnerable tenants who may face particular difficulties in securing new housing." (AAB, p. 44.) Neither bears the slightest scrutiny.

The goal of protecting housing stock may justify restrictions on condominium conversion *generally*—and the City has extremely

---

[15] *See Planned Parenthood v. Casey*, 505 U.S. 833, 861 (1992) (O'Connor, J., for the Court).

complicated regulations governing such conversions (*see* S.F. Subdivision Code §§ 1380-1397; copy attached). However, the City provides no rationale for singling out landlords who have engaged in buyouts for *special treatment*, by prohibiting them from even attempting to comply with the conversion regulations that apply to other landlords who have not evicted their prior tenants. This *special treatment* is arbitrary and capricious.

Nor does the City try to explain how, if the purpose is to protect the ability of senior, disabled, or catastrophically ill persons to find housing, there is any rational basis for regulating *only* those landlords who have engaged in successful negotiations, by paying senior, disabled, or catastrophically ill tenants an amount that those tenants deem sufficient to compensate them for the trouble, and who have fully complied with all of the procedural protections built into the Ordinance itself. The landlord, after all, cannot compel the tenant to enter a buyout agreement; attempting to do so already comes with severe civil and criminal penalties under Proposition M. And a tenant who enters such a contract will now do so after having received extensive disclosures and notices of their rights.

Clearly, the real purpose of the condo conversion ban is to chill the exercise—by landlords and tenants—of lawful rights, specifically the right to

voluntarily agree to the tenant's vacating a rental unit in exchange for compensation.

## VII.

## **CONCLUSION**.

The judgment should be **OVERRULED**.

Respectfully submitted,

Dated: October 4, 2016    NIELSEN MERKSAMER
                PARRINELLO GROSS & LEONI LLP

By:   /s/James R. Parrinello
       James R. Parrinello

/s/Christopher E. Skinnell
       Christopher E. Skinnell

/s/James W. Carson
       James W. Carson

*Attorneys for Plaintiffs - Appellants*
SAN FRANCISCO APARTMENT ASSOCIATION, COALITION FOR BETTER HOUSING, SMALL PROPERTY OWNERS OF SAN FRANCISCO INSTITUTE, SAN FRANCISCO ASSOCIATION OF REALTORS, AND NORMAN T. LARSON

**Form 6.** **Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒ this brief contains _____6,999_____ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☐ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* _____ *(state font size and name of type style)* _____ *, or*

    ☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)* _____ .

    Signature | /s/ Christopher E. Skinnell

    Attorney for | Plaintiff-Appellants San Francisco Apartment Assn, et al

    Date | Oct 4, 2016

| 9th Circuit Case Number(s) | 15-17381 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Oct 4, 2016 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Christopher E. Skinnell

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)

# ADDENDUM A

# Appellants' Reply Brief

*San Francisco Apartment Assn, et al. v. City & County of San Francisco*
Appeal No. 15-17381

# **Table of Contents**

Page(s)

1.    San Francisco Subdivision Code §§ 1380-1397 ............................... 1-20

## ARTICLE 9:
## CONVERSIONS

| | |
|---|---|
| Sec. 1380. | General. |
| Sec. 1380.1. | Units Legalized Pursuant to Planning Code Section 207.3. |
| Sec. 1381. | Additions to Application Packet. |
| Sec. 1382. | Exceptions from Application Packet. |
| Sec. 1383. | Conformity of Housing, Building and Planning Codes. |
| Sec. 1385. | Preservation of Low and Moderate Income Housing. |
| Sec. 1385A. | Suspension of Provisions of Section 1385. |
| Sec. 1386. | Denial of Tentative Map. |
| Sec. 1387. | Right of Tenants to Contract for the Purchase of Unit. |
| Sec. 1388. | Tenant Intent to Purchase. |
| Sec. 1389. | Temporary Relocation of Tenants. |
| Sec. 1390. | Rent Increase Limitation. |
| Sec. 1391. | Vacation of Units: Statutory Notice of Eviction Required; Extension of Leases for Elderly Tenants. |
| Sec. 1392. | Subdivider to Provide Moving Expenses. |
| Sec. 1393. | Subdivider to Provide Relocation Assistance. |
| Sec. 1394. | Time Limits for Reapplication. |
| Sec. 1395. | Time Limits for Sale. |
| Sec. 1396. | Annual Conversion Limitation. |
| Sec. 1396.1. | Annual Conversion Limitation Lottery Procedures. |
| Sec. 1396.2. | Prohibition on Condominium Conversions for Certain Buildings. |
| Sec. 1396.3. | Annual Conversion Limitation Lottery Procedures Based on Seniority of Participation. |
| Sec. 1396.4. | Condominium Conversion Fee and Expedited Conversion Program. |
| Sec. 1396.5. | Suspension of the Lottery Pending Production of Replacement Units for Expedited Conversion Units. |
| Sec. 1396A. | Low and Moderate Income Housing Review. |
| Sec. 1397. | Certification of Exempt Conversions. |

### SEC. 1380.  GENERAL.

The Sections of this Article 9 modify the applicable provisions of Article 3 through 8, inclusive, of this Code in the case of Conversions.

### SEC. 1380.1.  UNITS LEGALIZED PURSUANT TO PLANNING CODE SECTION 207.3.

Notwithstanding any other provisions of this Code, a dwelling unit constructed without benefit of permit and legalized pursuant to the

provisions of Section 207.3 of the Planning Code may not be subdivided in a manner that would allow for the unit to be sold or separately financed pursuant to any condominium plan, housing cooperative, or similar form of separate ownership.

(Added by Ord. 43-14 , File No. 131148, App. 4/17/2014, Eff. 5/17/2014)

## SEC. 1381.  ADDITIONS TO APPLICATION PACKET.

(a)   Application Packets for Conversions shall contain the following information in addition to that required by previous provisions of this Code:

(1)   A building history detailing the date of construction, major uses since construction, major repairs since construction, current ownership of buildings and underlying land, and the proposed ownership upon conversion;

(2)   A report of residential record ("3-R Report"), obtained from the Bureau of Building Inspection;

(3)   A rental history detailing for each unit the size in square feet, the number of bedrooms, the current or last rental rate, the monthly rental rate for the preceding five years, the monthly vacancy over the preceding three years, and the names of the current tenant or tenants for each unit, including the names of all tenants aged 62 or older or permanently disabled who have resided in the building over the past three years to the extent that such information is known or can be made known to the subdivider;

(4)   A building condition and sales program report including:

(A)   A building inspector's report made by either the Bureau of Building Inspection or a certified engineer or architect acceptable to the Bureau of Building Inspection; with said report to contain any Housing Code violations and incipient or potential deficiencies including electrical, plumbing and boiler and energy conservation requirements; where a building to be converted to condominiums is two years old or less, a Certificate of Completion issued by the Bureau of Building Inspection may be accepted in lieu of a building inspector's report;

(B)   A statement of repairs and improvements and projected cost of same the subdivider plans to make before conveyance of the units by the subdivider;

(C)   A list of the proposed sales prices for each unit including an indication as to whether the unit will be sold in fee simple or a leasehold interest, the estimated condominium association dues, the rentals if a leasehold interest is proposed, and a statement of the proposed sales program, particularly plans to promote affirmative action in housing; this information to be used to assure compliance with the requirements of this Code and SMA. The sales prices listed for each unit shall remain in effect and shall not be increased by the subdivider until the unit is sold to the tenant or until the tenant has waived his or her right of first refusal and the unit is made available to the general public, provided the sales price may be increased by the following amounts: (1) The percentage increase in the Housing Component of the "Bay Area Consumer Price Index, U.S. Dept. of Labor," above the price index in existence as of the date the application is filed; and (2) the pro rata actual cost of any repairs or improvements made by the applicant in addition to those set forth in the application, pursuant to Section 1381(a)(4)(B). During this period of time, any reduction in price of any one unit from the price level indicated on the statement shall not be made without comparable reductions to the prices of all other units;

(D)   A summary of tenant contacts including all meetings held with tenants and all information provided to them about the project and their own options; a list of all tenants who have expressed a desire to buy their own units; proposed methods of dealing with those tenants who do not plan to buy, especially those aged 62 or older, the permanently disabled and families with children; and any proposed program for relocation services;

(5)   The survey information obtained pursuant to Section 1388 of this Code and as further required in the Subdivision Regulations;

(6)   Notice to tenants:

(A)   Within five days of filing an application with the Department of Public Works for condominium conversion subdivision, the subdivider shall give written notice concerning the proposed conversion to all lessees and tenants. If five or more units are involved, said notice shall advise all lessees and tenants that a public hearing concerning the application for conversion will be held and that notice of said hearing will be given to all lessees and tenants by the City Planning Commission. Said notice shall contain all the information as required in Subsections 4 and 8 of this Section. Said notice shall contain a description of the rights of tenants as herein provided, including the right of first refusal to purchase the unit, the right to attend and be heard at the public hearing, the right to receive relocation assistance and benefits, the right of all tenants to extend occupancy for a period of from one to three years depending upon length of prior occupancy, the right of elderly and disabled tenants to a lifetime lease, and the prohibition against rent increases during the process of conversion;

(B)   Notice of the proposed conversion must be given to all persons or parties who lease or reside in any units which are

proposed for conversion subsequent to approval of the application for conversion;

(C)   The application packet for conversion shall include a statement that such notice has been given, and will continue to be given to any lessees or tenants subsequent to the submission of the application packet for conversion;

(7)   A copy of the purchase agreement to be used for the project;

(8)   Copies of all management documents submitted to the California State Department of Real Estate.

(b)   When neither new buildings nor major additions to existing facilities are indicated in the Tentative Map, a Statement of Known Soil and Geologic Conditions may be substituted for the required Soil and Geologic Reconnaissance Report. Said Statement shall be prepared by the engineer or surveyor who prepares the Tentative Map and shall contain the following information as taken from the latest U.S. Geologic Maps:

(1)   Soil deposits;

(2)   Rock formations;

(3)   Faults;

(4)   Groundwater; and

(5)   Landslides.

(Amended by Ord. 72-82, App. 2/19/82)

## SEC. 1382.  EXCEPTIONS FROM APPLICATION PACKET.

(a)   Application Packets for Conversions shall have deleted the following information required by provisions of this Code:

(1)   Except as otherwise required by other Sections of this Article 9, the statements required by Sections 1323(a), paragraphs 1, 2, and 3 shall be deleted.

(2)   Except in the case of a vesting tentative map, the environmental evaluation data required by Section 1323(b) shall be deleted.

(Amended by Ord. 576-85, App. 12/27/85)

## SEC. 1383.  CONFORMITY OF HOUSING, BUILDING AND PLANNING CODES.

As a condition of Final Map approval, the subdivider must demonstrate that all applicable provisions of the City's Housing, Building and City Planning Codes have been met and that all violations of such codes have been satisfactorily corrected or, upon the approval of the Director, and prior to recordation of the Final Map or Parcel Map, funds have been adequately escrowed or bonded to assure completion of such corrective work prior to the closing of escrow of any unit in the project.

## SEC. 1385.  PRESERVATION OF LOW AND MODERATE INCOME HOUSING.

The provisions of this Section and its application to certain properties may be affected by amendments creating Section 1344. Please consult Section 1344 in addition to this Section for Units subject to the Below Market Rate Condominium Conversion Program.

The Department of City Planning shall determine whether any units to be converted are part of the City's low and moderate income housing stocks. If the Department of City Planning determines that any unit to be converted is part of the City's low or moderate income housing stocks, then the price of the unit upon conversion shall not be such as to remove if effectively from said low or moderate income housing stocks and shall be no greater than 2.5 times the highest income level for low and moderate income households as defined in Section 1309(e) and (f), and as adjusted for household size according to the size of the dwelling, as set forth in Sections 1309(1) and (m). The resulting sales prices established pursuant to this formula may be increased consistent with any increases in the housing component of the "Bay Area Cost of Living Index, U.S. Dept. of Labor," during the period between the most recent establishment of the above highest income levels and the date of commencement of sales. If the tenant does not exercise the contract right to purchase the unit which has been determined to be part of the low or moderate income housing stock, then the unit shall be made available exclusively for purchase by qualified households of low or moderate income on first-come, first-served basis for a period of not less than 12 months from the date of the decision by the tenant not to exercise the contract right to purchase or, if there is no tenant, from the date of issuance of the State Department of Real Estate Final Subdivision Public Report, at a price no greater than that allowed under the low and moderate income price guidelines set forth above. Priority, however, shall be given to low or moderate income households who can demonstrate that they had previously relocated from a dwelling in a building which has been

approved for condominium conversion. The alternatives for low and moderate income occupancy set forth in Section 1341 shall not apply, except for those additional number of units which may be required pursuant to Section 1341 to be made available for rental or for purchase by households of low or moderate income. In cases where no low or moderate income household has purchased or contracted to purchase such unit within this 12-month period, after good-faith efforts by the subdivider, the subdivider may offer the unit to the general public with no price limitation.

(Amended by Ord. 45-82, App. 2/11/82; Ord. 257-88, App. 6/22/88; Ord. 320-08, File No. 080520, App. 12/19/2008)

## SEC. 1385A. SUSPENSION OF PROVISIONS OF SECTION 1385.

(1) The provisions of Section 1385 shall not apply to applications for initial conversion of residential units filed on or after June 1, 1988. For purposes of this Section initial conversion shall mean the first time the parcel containing the subject units is converted to condominiums.

(2) The suspension of Section 1385 shall continue so long as the 200 unit annual conversion limit set forth in Section 1396 remains in effect.

(Added by Ord. 257-88, App. 6/22/88)

## SEC. 1386. DENIAL OF TENTATIVE MAP.

When the City Planning Commission determines that vacancies in the project have been increased, or elderly or permanently disabled tenants displaced or discriminated against in leasing units, or evictions have occurred for the purpose of preparing the building for conversion, or if rents in the project over the previous 18 months preceding the date of filing the application have been increased substantially greater than any increase in the residential rent component of the "Bay Area Cost of Living Index, U.S. Dept. of Labor," (except for increases reasonably related to construction of Code-required capital improvements directly related to Code enforcement, or to recoup the costs thereof), or when the City Planning Commission determines that the subdivider has knowingly submitted incorrect information (to mislead or misdirect efforts by agencies of the City and County of San Francisco in the administration of this Code), the Tentative Map shall be disapproved and the subdivider may not reapply for 18 months from the date of denial. In evaluation of the current vacancy level under this Section, the increase in rental rates for each unit over the preceding five years and the average monthly vacancy rate for the project over the preceding three years shall be considered. In the evaluation of displacement of elderly tenants any such displacements over the preceding three years, and the reasons therefor, shall be considered.

(Amended by Ord. 86-81, App. 2/20/81)

## SEC. 1387. RIGHT OF TENANTS TO CONTRACT FOR THE PURCHASE OF UNIT.

(a) The present tenant or tenants at the date of filing of the application for a Tentative Map of any unit to be converted or, in the event of a voluntary vacation, or eviction for cause, the tenant or tenants in occupancy at the date of issuance of the State Department of Real Estate's Final Subdivision Public Report shall be given a nontransferable contract right to purchase the unit occupied at a price no greater than the price offered to the general public.

(b) The right of contract for purchase of the unit shall extend for 60 days from the date the unit is initially offered to the tenant in writing by the subdivider. The period of acceptance of the offer may be extended if such an agreement is executed in writing by the subdivider and tenant, provided that the tenant may cancel the purchase agreement if the unit is not conveyed to that tenant within six months of the agreement to purchase.

(c) The offer of sale may not be extended by the subdivider to the tenant until the recordation of the Final Map or Parcel Map, and until the issuance of the State Department of Real Estate's Final Subdivision Public Report.

## SEC. 1388. TENANT INTENT TO PURCHASE.

No application for conversion shall be approved unless there are substantial numbers of tenants who have indicated their intent to purchase their rental unit. This intent shall be evidenced by the submittal in writing by no less than 40 percent of the tenants of intent to purchase forms, as provided by the Department of Public Works. In obtaining or soliciting intent to purchase forms from tenants, subdividers shall comply with any restrictions set forth in the California Business and Professions Code and Regulations of the Real Estate Commissioner. In calculating the total number of units necessary to satisfy this provision, there shall be included in the 40 percent requirement any units in which the occupant qualified for and has expressed an intent to obtain a renewable lifetime lease pursuant to Section 1391(c).

Any tenant intent to purchase forms obtained by way of an inducement of the subdivider to provide benefits to that tenant beyond

those established by the Code shall be so identified and the specific representations of the subdivider shall be set forth in detail. All such intent to purchase forms shall become a matter of public record and the subdivider shall be required to comply with his or her representations as conditions of approval.

The intent to purchase forms, once signed by a tenant, shall be irrevocable by said tenant, for purposes of compliance with this Section, provided, however, that the Director shall invalidate any such form upon a determination that the subdivider has used coercion, fraud, duress, misrepresentation or threat in connection with obtaining or soliciting such form.

(Amended by Ord. 161-01, File No. 010891, App. 7/9/2001; Ord. 281-04, File No. 041353, App. 12/1/2004)

## SEC. 1389.  TEMPORARY RELOCATION OF TENANTS.

If temporary relocation of any tenant is necessary for renovation of a unit between the date of submission of the Tentative Map and the date established for permanent relocation, then the subdivider shall find equivalent substitute housing for that tenant for the period of renovation, and shall pay to that tenant any additional cost of the substitute housing. Any tenant temporarily relocated shall have the right to return to his or her former unit until the expiration of all rights granted to such tenant as provided in this Code.

## SEC. 1390.  RENT INCREASE LIMITATION.

The rent to tenants at the time of filing the application for conversion shall not be increased for the period between the filing of the application until relocation takes place or until the subdivision is denied or withdrawn, except that such period shall not exceed two years. At the end of such period, and for one-year period thereafter, any increase in rent shall not exceed the proportionate increase in the residential rent component of the "Bay Area Cost of Living Index, U.S. Dept. of Labor," over that period of time, provided, that the rental increase provisions of this section shall be operative only in the absence of other rent increase or arbitration laws. In cases of hardship due to unusual circumstances to the subdivider, or in cases where a rent increase authorized herein is considered by the tenant to be not consistent with increases in the residential rent component of the "Bay Area Cost of Living Index, U.S. Dept. of Labor," either a subdivider or a tenant may request relief under this Section from the Director of Public Works or his or her designee. In considering the reasonableness of a rent increase, the Director shall consider the current rent paid for comparable units in comparable areas.

## SEC. 1391.  VACATION OF UNITS: STATUTORY NOTICE OF EVICTION REQUIRED; EXTENSION OF LEASES FOR ELDERLY TENANTS.

(a)   Except for tenants availing themselves of the lease option set forth below, each nonpurchasing tenant shall be given 120 days from the date of receipt of notification from the subdivider of the intent to convert (as required in California Government Code Section 60427.1) to find substitute housing and to relocate. The subdivider shall not transmit such notice, however, prior to recordation of the Final Map or Parcel Map. If any tenant has a lease to occupy a unit in which the term of said lease extends longer than the 120-day period provided herein, such tenant shall not be evicted except for cause until the expiration of such lease.

Each nonpurchasing tenant shall be given the option of entering into or renewing a lease agreement to occupy said tenant's dwelling unit for period of up to one year following the date of approval of the Final Map; the rental charge and rights and obligations of the parties during said period shall be in accordance with Subsection (c) of this Section.

(b)   Upon expiration of all such time requirements and upon satisfaction of any conditions required for conformity with the Master Plan, including the recordation of the Final Map or Parcel Map, the tenant shall also be entitled to the statutory period for notice of eviction as provided in California Civil Code Section 1946.

This provision shall not affect the requirement that a tenant receive relocation services and reimbursements for moving expenses provided that the tenant request and be eligible for said services as provided in Section 1392 and Section 1393, and provided that the time for relocation assistance not extend beyond the 120-day period of the notice of intent to convert or any lease extension as required in Subsection (a) of this Section.

(c)   No subdivider or subsequent condominium unit owner shall refuse to renew a lease or extend a rental agreement to any nonpurchasing tenant aged 62 or older at the time of recordation; of the Final Map or Parcel Map, or any tenant permanently disabled. Any extended leases or rental agreements made pursuant hereto shall expire only upon the death or demise of such tenant or the last surviving member of the tenant's household, provided such surviving member is related to the tenant by blood or marriage and is aged 62 or older at the time of death or demise of such tenant, or at such time as the tenant voluntarily vacates the unit after giving due notice of such intent to vacate. Each lease shall contain a provision allowing the tenant to terminate the lease and vacate the unit upon 30 days' notice. Rent charged during the term of any extended lease or rental agreement pursuant to the provisions of this Section shall not exceed the rent charged at the time of filing of the application for conversion, plus any increases proportionate to the increases in

the residential rent component of the "Bay Area Cost of Living Index, U.S. Dept. of Labor," provided that the rental increase provisions of this Section shall be operative only in the absence of other applicable rent increase or limitation laws. This Section shall not alter or abridge the rights or obligations of the parties in performance of their covenants, including but not limited to the provision of services, payment of rent or the obligations imposed by Sections 1941, 1941.1 and 1941.2 of the California Civil Code. There shall be no decrease in dwelling unit maintenance or other services historically provided to such units and such tenants.

## SEC. 1392.  SUBDIVIDER TO PROVIDE MOVING EXPENSES.

(a)   The subdivider shall bear the cost of moving expenses of any tenant who relocates from the building to be converted. The tenant, at his or her option, shall be reimbursed either for the actual moving expenses up to a maximum of $1,000, or for the fixed amount allowed by the moving expense schedule of the Central Relocation Services agency. In the event the unit is occupied by a subtenant under an agreement with the tenant, the moving expense reimbursement herein provided shall be shared proportionately by both parties in relation to the actual costs of moving the property of each party.

(b)   Availability for such assistance shall be limited to the 120-day period or the period of any lease extension as provided in Section 1391(a) unless a contrary agreement is reached by the subdivider and tenant; provided that tenants aged 62 years or older, or permanently disabled whose tenancy is extended pursuant to Section 1391(c), would be eligible for such assistance at such time that such tenant elects to voluntarily vacate the unit and gives due notice therefor.

(c)   Those parties who lease a unit subsequent to the date of filing the application for conversion shall not be eligible to receive assistance provided in this Section unless such an agreement is made between the subdivider and prospective tenant.

## SEC. 1393.  SUBDIVIDER TO PROVIDE RELOCATION ASSISTANCE.

(a)   Any tenant who requests assistance in finding relocation housing shall be referred to the Central Relocations Services Agency of the City and County of San Francisco, or, with the mutual consent of the tenant and subdivider, such assistance may be provided by the subdivider or a real estate brokerage firm selected by the subdivider. The subdivider shall bear any costs to the tenant of such assistance in finding relocation housing.

(b)   Availability for such assistance shall be limited to the expiration of the 120-day period or the period of any lease as provided in Section 1391(a) and (c), unless a contrary agreement is reached by the subdivider and tenant.

(c)   Those parties who lease a unit subsequent to the date of filing the application for conversion shall not be eligible to receive assistance provided in this Section unless such an agreement is made between the subdivider and prospective tenant.

## SEC. 1394.  TIME LIMITS FOR REAPPLICATION.

(a)   In the event an application for condominium conversion subdivision is withdrawn by the applicant, said application may not be resubmitted for six months from the date of withdrawal.

(b)   In the event an application for condominium conversion subdivision is denied, or a Tentative Map is disapproved, the applicant therefor may not submit a new application for the same building for one year from the date of such denial, except that this period may be extended pursuant to the provisions of Section 1386.

## SEC. 1395.  TIME LIMITS FOR SALE.

All units approved for conversion shall be offered for sale to the tenants within one year of the issuance of the State Department of Real Estate's Final Subdivision Public Report.

## SEC. 1396.  ANNUAL CONVERSION LIMITATION.

(a)   This Section governing annual limitation shall apply only to conversion of residential units. This Section also is subject to the limitations established by Section 1396.5's suspension of the lottery.

(b)   Applications for conversion of residential units, whether vacant or occupied, shall not be accepted by the Department of Public Works, except that a maximum of 200 units as selected yearly by lottery by the Department of Public Works from all eligible applicants, may be approved for conversion per year for the following categories of buildings:

(1)   Buildings consisting of four units in which at least three of the units have been occupied continuously by the applicant owners of record as their principal place of residence for three years prior to the date of registration for the lottery as selected by the Director;

(2)   Buildings consisting of three units in which at least two of the units have been occupied continuously by the applicant owners of record as their principal place of residence for three years prior to the date of registration for the lottery as selected by the Director;

(3)   Buildings consisting of two units in which at least one unit has been occupied continuously by the applicant owner of record as his or her principal place of residence for three years prior to the date of registration for the lottery as selected by the Director;

(4)   Buildings consisting of five or six units that were subject to the requirements of Section 1396.2(f) on or before April 15, 2013 where (A) no further evictions as set forth in Section 1396.2 have occurred in the building after April 15, 2013, (B) the building and all applicants first satisfied all the requirements for conversion under Section 1396.2(f) after January 24, 2020 and before resumption of the lottery under Section 1396.5; and (C) 50 percent or more of the units have been occupied continuously by owners of record as their principal place of residence for ten years prior to the date of registration for the lottery as selected by the Director. Applicants for such buildings must apply for the lottery within five years of the resumption of the lottery under Section 1396.5(c) and remain eligible until selected;

(5)   If the Expedited Conversion program under Section 1396.4 has been suspended until 2024 as a result of a successful lawsuit against the City and County of San Francisco challenging Section 1396.4(g) or 1396.5: (A) buildings consisting of five or six units that participated in but were not selected for the 2012 or 2013 condominium conversion lottery in which 50 percent or more of the units have been occupied continuously by the applicant owners of record for no less than six years prior to the date of registration for the lottery as selected by the Director or (B) buildings consisting of five or six units in which: (i) 50 percent or more of the units have been occupied continuously by the applicant owners of record for no less than six years prior to the date of registration for the lottery as selected by the Director and (ii) the eligible applicant owners of record have a fully executed written agreement as of April 15, 2013 in which the owners each have an exclusive right of occupancy to individual units in the building to the exclusion of the owners of the other units. Applicants for buildings identified in this Subsection must first apply for the lottery within five years of the resumption of the lottery under Section 1396.5(c) and remain eligible until selected; or

(6)   Community apartments as defined in Section 1308 of this Code, which, on or before December 31, 1982, met the criteria for community apartments in Section 1308 of this Code and which were approved as a subdivision by the Department of Public Works on or before December 31, 1982, and where 75 percent of the units have been occupied continuously by the applicant owners of record for three years prior to the date of registration for the lottery as selected by the Director.

(c)   The conversion of a stock cooperative as defined in Section 1308 of this Code to condominiums shall be exempt from the annual limitation imposed on the number of conversions in this Section and from the requirement to be selected by lottery where 75 percent of the units have been occupied for the lottery as selected by the Director.

(d)   No application for conversion of a residential building submitted by a registrant shall be approved by the Department of Public Works to fill the unused portion of the 200-unit annual limitation for the previous year.

(e)   (1)   Any application for a condominium conversion submitted after being selected in the lottery must meet the following requirements applicable to Subdivision Code Article 9, Conversions: Sections 1381, 1382, 1383, 1386, 1387, 1388, 1389, 1390, 1391(a) and (b), 1392, 1393, 1394, and 1395.

(2)   Any building subject to Section 1396.2 shall have all applicant(s) satisfy all the requirements for conversion under Section 1396.2(f) in order to be eligible to convert pursuant to this Section 1396; provided, however, that any building subject to the prohibition on conversion under Section 1396.2, in particular a property with the eviction(s) set forth in Section 1396.2(b), is ineligible for conversion.

(3)   (A)   In addition, the applicant(s) shall certify that to the extent any tenant vacated his or her unit within the seven years prior to the date of registration for the lottery as selected by the Director and before recordation of the  final parcel or subdivision map, such tenant did so voluntarily or if an eviction or eviction notice occurred it was not pursuant to Administrative Code Sections 37.9(a)(8)-(14) unless such eviction or eviction notice complied with the requirements of Subsections (B)-(D) below.

(B)   If the evicting owner(s) recovered possession of the unit under Administrative Code Sections 37.9(a)(11) or 37.9(a)(14), then the applicant(s) shall certify that the original tenant reoccupied or was given an opportunity to reoccupy the unit after the temporary eviction.

(C)   If the evicting owner(s) recovered possession of the unit under Administrative Code Section 37.9(a)(10), then the applicant(s) shall certify that the Department of Building Inspection required the unit be demolished or permanently removed from housing use pursuant to a Notice of Violation or Emergency Order or similar notice, order, or act; all the necessary permits for demolition or removal were obtained; that the evicting owner(s) complied in full with Administrative Code Section 37.9(a)(10) and (c); and that an additional unit or replacement unit was not constructed in the building after the demolition or removal of the unit previously occupied by the evicted tenant.

(D)   If the evicting owner(s) recovered possession of a unit under Administrative Code Section 37.9(a)(8), then the applicants

shall certify that: (i) only one unit in the building was the subject of such eviction during the seven year period, (ii) any surviving owner or relative named as the intended resident of the unit in the Section 37.9(a)(8) eviction notice also is presently an owner applying for the conversion of the same unit, and (iii) the subject applicant owner has occupied the unit continuously as his or her principal residence for three years prior to the date of registration for the lottery as selected by the Director.

(4)   Notwithstanding any provisions in this Code to the contrary, the Department of Public Works shall not sell residential condominium conversion lottery tickets to, shall not accept a residential condominium conversion subdivision application from, and shall deny a tentative or final subdivision or parcel map for residential condominium conversion submitted by the owner(s) of a building if on or after October 31, 2014, (A) a senior, disabled, or catastrophically ill tenant in the building entered into a Buyout Agreement, as defined in Administrative Code Section 37.9E, for any unit in the building, or (B) two or more tenants entered into Buyout Agreements during the period beginning ten years prior to the date of the application and ending on the date of the final or parcel map approval. This Subsection (e)(4) shall apply without regard to whether the current owner(s) was a party to the Buyout Agreement, provided that the Buyout Agreement was reported to the Rent Board as provided in Administrative Code Section 37.9E prior to the current owner(s) purchasing the building. For purposes of this subsection, a "senior" shall be a person who is 60 years or older and has been residing in the unit for ten years or more at the time of Buyout Agreement; a "disabled" tenant shall be a person who is disabled within the meaning of Title 42 United States Code Section 12102 and has been residing in the unit for ten years or more at the time of Buyout Agreement; and a "catastrophically ill" tenant shall be a person who is disabled within the meaning of Title 42 United States Code Section 12102 and who is suffering from a life threatening illness as certified by his or her primary care physician and has been residing in the unit for five years or more at the time of Buyout Agreement.

(f)   The Department shall review all available records, including eviction notices and records maintained by the Rent Board for compliance with Subsection (e). If the Department finds that a violation of Subsection (e) occurred prior to recordation of the final map or final parcel map, the Department shall disapprove the application or subject map. If the Department finds that a violation of Subsection (e) occurred after recordation of the final map or final parcel map, the Department shall take such actions as are available and within its authority to address the violation.

(Amended by Ord. 498-85, App. 11/15/85; Ord. 426-89, App. 11/22/89; Ord. 418-93, App. 12/23/93; Ord. 434-97, App. 11/25/97; Ord. 372-98, App. 12/18/98; Ord. 161-01, File No. 010891, App. 7/9/2001; Ord. 48-03, File No. 030099, App. 4/3/2003; Ord. 281-04, File No. 041353, App. 12/1/2004; Ord. 6-07, File No. 061519, App. 1/18/2007; Ord. 238-08, File No. 081087, App. 10/30/2008; Ord. 117-13 , File No. 120669, Pass. 6/18/2013; Ord. 225-14 , File No. 140874, Eff. 12/7/2014, Oper. 3/7/2015)

## SEC. 1396.1.  ANNUAL CONVERSION LIMITATION LOTTERY PROCEDURES.

This Section shall govern conduct of the lottery required by Section 1396 for the conversion of residential units.

(a)   The lottery shall be comprised of two pools (Pool A and Pool B).

(b)   **Pool A.**

(1)   For the 1995 lottery, Pool A shall consist only of those eligible buildings which participated but which failed to be selected in any previous lottery held during the years 1990 through 1994. For the 1996 lottery, Pool A shall consist of only those eligible buildings which participated but failed to be selected in any lottery held during the years 1990 through 1994 and the 1995 lottery. For all subsequent lotteries after 1996, Pool A shall consist of only those eligible buildings which participated but which have failed to be selected for conversion in at least three previous lotteries, two of which must be lotteries held after 1994. If all buildings eligible in Pool A comprise 100 or fewer units, all such buildings shall automatically be approved for conversion. Any unallocated units in Pool A shall be added to Pool B.

(2)   If all buildings eligible in Pool A comprise more than 100 units, the Director of the Department of Public Works (Director) shall conduct a lottery among the buildings eligible for Pool A so that no more than 100 units are selected for conversion in Pool A. All buildings not selected for conversion through the Pool A lottery shall then participate in Pool B, under the procedures set forth below.

(c)   **Pool B.**

(1)   Pool B shall consist of all eligible buildings pursuant to Section 1396 above, together with any buildings from Pool A that were not selected for conversion in the Pool A lottery.

(2)   Buildings from Pool B shall be selected for conversion by random selection of lottery tickets submitted for eligible buildings.

(3)   Each building in Pool B shall receive one lottery ticket for the current lottery, plus a maximum of one lottery ticket for any and all lotteries held during the years 1990 through 1994 in which the building participated but failed to be selected for conversion in the lottery, plus one lottery ticket for every lottery after 1994 in which the building participated but failed to be selected for conversion.

(4)  No building in Pool B shall receive more than five tickets.

(d)  Applicants shall provide proof of participation in past lotteries to the Director.

(1)  Proof of participation in any lottery held during the years 1990 through 1994 shall be as follows:

(i)  Presentation by the registrant of a letter of regret from the Director for any lottery held during the years 1990 through 1994; or

(ii)  Presentation by the registrant of a cancelled check for payment of lottery registration fees from any lottery held during the years 1990 through 1994; or

(iii)  Any other proof of participation in any lottery held during the years 1990 through 1994, as determined acceptable by the Director.

(2)  Proof of participation in any lottery held in or after 1995 shall be determined upon presentation by the registrant of a letter of regret from the Director.

(e)  Commencing with the 1997 lottery, any building seeking more than one lottery ticket shall demonstrate to the satisfaction of the Director that one or more of the qualified owners of the building were owners of the building at the time of the lotteries in which the building participated but failed to be selected for conversion.

(f)  For purposes of determining whether a building failed to be selected for conversion in a previous lottery:

(1)  Those buildings which were chosen in a previous lottery but were not converted for any reason whatsoever shall not be considered as having failed to be selected in that lottery.

(2)  Any previous failures to be selected by lottery do not have to occur in consecutive years.

(3)  No credit shall be given for any year in which the building did not participate in the lottery.

(g)  In addition to the other provisions relating to Pool A and Pool B described in subsections (b) through (f) above:

(1)  the first 175 units selected by lottery in Pools A and B must meet the following requirements: the Applicant for the lottery must certify under penalty of perjury and the Department must verify with the Rent Stabilization and Arbitration Board, and with the Human Rights Commission as applicable, that since November 16, 2004, no eviction as defined in San Francisco Administrative Code Section 37.9(a)(8) - (14) of a senior, disabled person, or catastrophically ill tenant as defined below has occurred, or if an eviction has taken place under Administrative Code Section 37.9(a)(11) or (14), that the original tenant reoccupied the unit after a temporary eviction. For purposes of this section a "senior" shall be a person who is 60 years or older and has been residing in the unit for 10 years or more at the time of the lottery; a "disabled" tenant is defined for purposes of this Section as a person who is disabled within the meaning of Title 42 U.S.C. Section 12102(2)(A); and a "catastrophically ill" tenant is defined for purposes of this Subsection as a person who is disabled as defined above, and who is suffering from a life threatening illness as certified by his or her primary care physician.

(2)  If there are not 175 units that meet the requirements of subsection (g)(1) above, then the remaining units will not be awarded by lottery in that year's lottery or any future lottery. If there are more than 175 units that meet the requirements of subsection (g)(1) above, then those units may compete for the remaining 25 units as described in subsection (g)(3) below.

(3)  The remaining 25 units in Pool A and Pool B will be selected as described in subsections (b) through (f) and may, but do not need to, meet the additional requirements of subsection (g)(1) above.

(4)  If the Department determines that an Applicant has knowingly provided false material information under subsection (g)(1) above, the Department shall immediately deny the application for the lottery, or if the Applicant has submitted an application for conversion, shall immediately deny the application for conversion. Moreover, the Department, the Director or other authorized person or entity may also enforce the provisions of this Section under Section 1304 or any other applicable provision of law as warranted.

(h)  **Standby List.**

(1)  Once all units have been allocated in Pools A and B, the Department shall place the remaining buildings on a standby list as set forth in Subsection (2). Buildings on the standby list may convert if selected units in Pools A and B are unable to convert within the time limits that the Department establishes and as long as the maximum number of allocated units is not exceeded.

(2)  The Department shall determine the standby list by random selection in a lottery; provided, however, that only buildings satisfying the requirements of subsection (g)(1) shall participate in the lottery authorized under this Subsection. The standby list lottery

shall terminate after the Department selects the first 20 buildings.

(3)   All remaining buildings shall be kept on file with the Department. These buildings are eligible to convert if selected units in Pools A and B and the standby list lottery are unable to convert within the time limits that the Department establishes and as long as the maximum number of allocated units is not exceeded. In such an event, the Department shall conduct a random selection lottery among the remaining buildings for any unallocated units.

(Added by Ord. 428-94, App. 12/23/94; amended by Ord. 161-01, File No. 010891, App. 7/9/2001; Ord. 281-04, File No. 041353, App. 12/1/2004; Ord. 281-05, File No. 051462, App. 12/21/2005; Ord. 6-07, File No. 061519, App. 1/18/2007)

## SEC. 1396.2.   PROHIBITION ON CONDOMINIUM CONVERSIONS FOR CERTAIN BUILDINGS.

(a)   Notwithstanding any provisions in this Code to the contrary, including Section 1359, the Department of Public Works shall not sell residential condominium conversion lottery tickets to; shall not accept a residential condominium conversion subdivision application from; and shall deny a tentative subdivision or tentative parcel map for residential condominium conversion submitted by the owner(s) of a building that meets all of the following conditions:

(1)   the building had two or more evictions with each eviction associated with a separate unit(s);

(2)   issuance of each eviction notice occurred on or after May 1, 2005; and,

(3)   issuance of the eviction notice(s) occurred pursuant to San Francisco Administrative Code Sections 37.9(a)(8), 37.9(a)(10), 37.9(a)(11), or 37.9(a)(13).

(b)   Subsection (a) also shall apply to the owner(s) of a building with one or more evictions if the person(s) evicted was a senior, disabled, or catastrophically ill tenant and the issuance of the eviction notice occurred in accordance with the conditions of Subsections (a)(2) and (3).

(1)   For purposes of this Subsection, a "senior" shall be a person who is 60 years or older and has been residing in the unit for ten years or more at the time of issuance of the eviction notice; a "disabled" tenant is defined for purposes of this Section as a person who is disabled within the meaning of Title 42 U.S.C. Section 12102(2)(A); and a "catastrophically ill" tenant is defined for purposes of this Subsection as a person who is disabled as defined above, and who is suffering from a life threatening illness as certified by his or her primary care physician.

(c)   Subsections (a) and (b) shall apply to all buildings subject to such provisions without regard to whether the current owner(s) initiated or otherwise participated in the eviction(s).

(d)   If the Department determines that an applicant has knowingly provided false material information concerning subsections (a) or (b) above, the Department shall immediately deny the application for the lottery, or if the applicant has submitted an application for conversion, shall immediately deny the application for conversion. Moreover, the Department, the Director, or other authorized person or entity may also enforce the provisions of this Section under section 1304 or any other applicable provision of law as warranted.

(e)   For purposes of subsections (a) and (b), "eviction" shall mean the issuance of a written notice terminating tenancy pursuant to Administrative Code Sections 37.9(a)(8), 37.9(a)(10), 37.9(a)(11), or 37.9(a)(13); provided, however, that if the property owner(s) issues then withdraws the eviction notice prior to its expiration and the tenant receiving the notice remains in tenancy for at least 120 days following the expiration of the notice, the property owner's action shall not be deemed an eviction pursuant to this subsection.

(f)   Notwithstanding the limitations set forth in Subsection (a), a building that meets the conditions of Subsections (a)(1) - (3) but did not result in the issuance of an eviction notice, as defined, to a senior, disabled, or catastrophically ill tenant shall be eligible for conversion ten (10) years following the date of the last eviction from the building. Conversion of a 2-unit building pursuant to this Section shall be subject to Section 1359 except that both units in the building shall be owner-occupied by the same owners of record for ten (10) years prior to the date of application for Conversion. Conversion of a building of up to six (6) units pursuant to this section shall be subject to the provisions of Article 9 except that the owner occupancy requirements of Sections 1396(a) and (b) shall be ten (10) years prior to the date of registration for the lottery as selected by the Director.

(g)   Notwithstanding the limitations set forth in Subsection (a) or (b), a building where one or more eviction notices, as defined, were issued after May 1, 2005, shall be exempt from this Section 1396.2 if each unit in the building was occupied by a separate owner of record on April 4, 2006, the introduction date of this legislation.

(Ord. 112-06, File No. 060443, App. 5/22/2006)

## SEC. 1396.3.   ANNUAL CONVERSION LIMITATION LOTTERY PROCEDURES BASED ON SENIORITY OF

**PARTICIPATION.**

This Section shall govern conduct of the lottery required by Section 1396 and shall prevail over the lottery selection process of Section 1396.1 for the conversion of residential units.

(a)   The lottery shall be comprised of two pools (Pool A and Pool B).

(b)   **Pool A.**

(1)   Pool A shall consist of only those eligible buildings which participated but which have failed to be selected for conversion in at least three previous lotteries. In addition, Pool A eligibility requires that each applicant for the lottery certify under penalty of perjury, and the Department must verify with the Rent Stabilization and Arbitration Board, and with the Human Rights Commission as applicable, that since January 1, 2000, no eviction as defined in San Francisco Administrative Code Section 37.9(a)(8) - (14) of a senior, disabled person, or catastrophically ill tenant as defined below has occurred, or if an eviction has taken place under Administrative Code Section 37.9(a)(11) or (14), that the original tenant reoccupied the unit after a temporary eviction. For purposes of this section a "senior" shall be a person who is 60 years or older and has been residing in the unit for 10 years or more at the time of the lottery; a "disabled" tenant is defined for purposes of this Section as a person who is disabled within the meaning of Title 42 U.S.C. Section 12102(2)(A); and a "catastrophically ill" tenant is defined for purposes of this Subsection as a person who is disabled as defined above, and who is suffering from a life threatening illness as certified by his or her primary care physician. If an applicant for Pool A cannot satisfy this certification requirement, the applicant shall participate in Pool B as set forth in Subsections (c) - (g). This certification also is subject to the procedures of Subsection (g)(4). If all buildings eligible in Pool A comprise 100 or fewer units, all such buildings shall automatically be approved for conversion. Any unallocated units in Pool A shall be added to Pool B.

(2)   If all buildings eligible in Pool A comprise more than 100 units, the Director of the Department of Public Works (Director) rank the buildings according to the number of times a building has participated in and failed to be selected in any lottery, to be known as a Class. The Director shall enter the buildings having participated the most times into the Senior Class. If the total number of units in the Senior Class exceeds 100 units, then the Director shall conduct a lottery among all the buildings eligible for the Senior Class so that no more than 100 units are selected for conversion in Pool A. If the total number of units in the Senior Class is fewer than 100 units, all buildings shall automatically be approved for conversion. If there are remaining units to be selected to reach the maximum total of 100 units in Pool A, the process will then proceed to the next most senior Class. If the next most senior Class would result in more than 100 total units being selected in Pool A, then the Director shall conduct a lottery among all the buildings eligible for the next most senior Class so that no more than 100 total units are selected for conversion in Pool A. If the number of units in next most senior Class(es) combined with the units previously selected in Pool A is fewer than 100 total units, all buildings in the next most senior Class shall automatically be approved for conversion. If there are remaining units to be selected to reach the maximum total of 100 units in Pool A, the process will then proceed as described above for the next most senior Class so that those buildings with the most seniority are prioritized over the junior Class(es). At such time as the number of units in the Class next eligible for conversion exceeds the total number of units remaining for selection in Pool A, a lottery will be held among that Class to determine which units shall be selected for conversion as part of Pool A. All buildings not selected for conversion through the Pool A lottery shall then participate in Pool B, under the procedures set forth below.

(c)   **Pool B.**

(1)   Pool B shall consist of all eligible buildings pursuant to Section 1396 above, together with any buildings from Pool A that were not selected for conversion in the Pool A lottery.

(2)   Buildings from Pool B shall be selected for conversion by random selection of lottery tickets submitted for eligible buildings.

(3)   Each building in Pool B shall receive one lottery ticket for the current lottery, plus one lottery ticket for every lottery in which the building participated but failed to be selected for conversion.

(d)   Applicants shall provide proof of participation in past lotteries to the Director.

(1)   Proof of participation in any lottery held during the years 1990 through 1994 shall be as follows:

(i)   Presentation by the registrant of a letter of regret from the Director for any lottery held during the years 1990 through 1994; or

(ii)   Presentation by the registrant of a cancelled check for payment of lottery registration fees from any lottery held during the years 1990 through 1994; or

(iii)   Any other proof of participation in any lottery held during the years 1990 through 1994, as determined acceptable by the Director.

(2)  Proof of participation in any lottery held in or after 1995 shall be determined upon presentation by the registrant of a letter of regret from the Director.

(e)  Commencing with the 1997 lottery, any building seeking more than one lottery ticket shall demonstrate to the satisfaction of the Director that the required number of qualified owners of the building were owners of the building at the time of the lotteries in which the building participated but failed to be selected for conversion.

(f)  For purposes of determining whether a building failed to be selected for conversion in a previous lottery:

(1)  Those buildings which were chosen in a previous lottery but were not converted for any reason whatsoever shall not be considered as having failed to be selected in that lottery.

(2)  Any previous failures to be selected by lottery do not have to occur in consecutive years.

(3)  No credit shall be given for any year in which the building did not participate in the lottery.

(g)  In addition to the other provisions relating to Pool A and Pool B described in subsections (b) through (f) above:

(1)  The first 175 units selected by lottery in Pools A and B must meet the following requirements: the Applicant for the lottery must certify under penalty of perjury and the Department must verify with the Rent Stabilization and Arbitration Board, and with the Human Rights Commission as applicable, that since November 16, 2004, no eviction as defined in San Francisco Administrative Code Section 37.9(a)(8) - (14) of a senior, disabled person, or catastrophically ill tenant as defined below has occurred, or if an eviction has taken place under Administrative Code Section 37.9(a)(11) or (14), that the original tenant reoccupied the unit after a temporary eviction. For purposes of this section a "senior" shall be a person who is 60 years or older and has been residing in the unit for 10 years or more at the time of the lottery; a "disabled" tenant is defined for purposes of this Section as a person who is disabled within the meaning of Title 42 U.S.C. Section 12102(2)(A); and a "catastrophically ill" tenant is defined for purposes of this Subsection as a person who is disabled as defined above, and who is suffering from a life threatening illness as certified by his or her primary care physician.

(2)  If there are not 175 units that meet the requirements of subsection (g)(1) above, then the remaining units will not be awarded by lottery in that year's lottery or any future lottery. If there are more than 175 units that meet the requirements of subsection (g)(1) above, then those units may compete for the remaining 25 units as described in subsection (g)(3) below.

(3)  The remaining 25 units in Pool A and Pool B will be selected as described in subsections (b) through (f) and may, but do not need to, meet the additional requirements of subsection (g)(1) above.

(4)  If the Department determines that an Applicant has knowingly provided false material information under subsection (g)(1) above, the Department shall immediately deny the application for the lottery, or if the Applicant has submitted an application for conversion, shall immediately deny the application for conversion. Moreover, the Department, the Director or other authorized person or entity may also enforce the provisions of this Section under Section 1304 or any other applicable provision of law as warranted.

(h)  **Standby List.**

(1)  Once all units have been allocated in Pools A and B, the remaining buildings shall be placed on a standby list as set forth in subsection (2). Buildings on the standby list may convert in the event that selected units in Pools A and B are unable to convert within the time limits that the Department establishes and as long as the maximum number of allocated units is not exceeded.

(2)  The standby list shall be determined by a lottery or, if necessary, a series of lotteries among a Class(es) of buildings prioritized by seniority of participation in the annual condominium conversion lottery. Only buildings satisfying the requirements of subsection (g)(1) shall be assigned to the standby list in the manner specified above. The standby list lottery shall terminate after the Department selects the first 20 buildings.

(3)  All remaining buildings shall be kept on file with the Department. These buildings are eligible to convert if selected units in Pools A and B and the standby list lottery are unable to convert within the time limits that the Department establishes and as long as the maximum number of allocated units is not exceeded. In such an event, the Department shall conduct a random selection lottery among the remaining buildings for any unallocated units.

(Added by Ord. 13-07, File No. 061563, App. 2/2/2007; Ord. 238-08, File No. 081087, App. 10/30/2008)

## SEC. 1396.4.  CONDOMINIUM CONVERSION FEE AND EXPEDITED CONVERSION PROGRAM.

(a)  **Findings.** The findings of Planning Code Section 415.1 concerning the City's inclusionary affordable housing program are incorporated herein by reference and support the basis for charging the fee set forth herein as it relates to the conversion of dwelling

units into condominiums.

(b)    Any building may be exempted from the annual lottery provisions of Section 1396 if the building owners for said building comply with Section 1396.3 (g)(1) and all the requirements of this Section 1396.4 . Notwithstanding the foregoing, no property or applicant subject to any of the prohibition on conversions set forth in Section 1396.2 , in particular a property with the eviction(s) set forth in Section 1396.2 (b), is eligible for the Expedited Conversion program under this Section 1396.4 . Eligible buildings as set forth in this Section (b) may exercise their option to participate in this program according to the following requirements:

(1)    Any building that participated in but was not selected for the 2012 or 2013 condominium conversion lottery consisting of (a) four units or less in which one unit has been occupied continuously by one of the applicant owners of record for no less than five years prior to April 15, 2013, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by the applicant owners of record for no less than five years as of April 15, 2013, is eligible for conversion under this Subsection. The applicant(s) for the subject building seeking to convert under this Subsection shall pay the fee specified in Subsection (e) no later than April 14, 2014 for the entire building along with additional information as the Department may require including certification of continued eligibility; however, the deadline for an applicant to pay the fee may be extended pursuant to (j)(3) of this Section.

(2)    Any building that participated in but was not selected for the 2012 or 2013 condominium conversion lottery consisting of (a) four units or less in which one unit has been occupied continuously by one of the applicant owners of record for no less than three years prior to April 15, 2014, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by the applicant owners of record for no less than three years as of April 15, 2014, is eligible for conversion under this Subsection. The applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2014 and shall pay the fee specified in Subsection (e) no later than January 23, 2015 along with additional information as the Department may require including certification of continued eligibility; however, the deadline for an applicant to pay the fee may be extended pursuant to (j)(3) of this Section.

(3)    For Additionally Qualified Buildings consisting of (a) four units or less in which one unit has been occupied continuously by one owner of record for  no less than six years as of April 15, 2015 or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by owners of record for no less than six years as of April 15, 2015, the applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2015 and shall pay the fee specified in Subsection (e) no later than January 22, 2016 along with additional information as the Department may require including certification of continued eligibility.

(4)    For Additionally Qualified Buildings consisting of (a) four units or less in which one unit has been occupied continuously by one owner of record for no less than six years as of April 15, 2016, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by owners of record for no less than six years as of April 15, 2016, the applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2016 and shall pay the fee specified in Subsection (e) no later than January 20, 2017 along with additional information as the Department may require including certification of continued eligibility.

(5)    For Additionally Qualified Buildings consisting of (a) four units or less in which one unit has been occupied continuously  by one owner of record for no less than six years as of April 15, 2017, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by owners of record for no less than six years as of April 15, 2017, the applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2017 and shall pay the fee specified in Subsection (e) no later than January 19, 2018 along with additional information as the Department may require including certification of continued eligibility.

(6)    For Additionally Qualified Buildings consisting of (a) four units or less in which one unit has been occupied continuously  by one owner of record for no less than six years prior to April 15, 2018, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously  by owners of record for no less than six years as of April 15, 2018, the applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2018 and shall pay the fee specified in Subsection (e) no later than January 25, 2019 along with additional information as the Department may require including certification of continued eligibility.

(7)    For Additionally Qualified Buildings consisting of (a) four units or less in which one unit has been occupied continuously by one owner of record for no less than six years prior to April 15, 2019, or (b) buildings consisting of five or six units in which 50 percent or more of the units have been occupied continuously by owners of record for no less than six years as of April 15, 2019, the applicant(s) for the subject building may apply for conversion under this Subsection on or after April 15, 2019 and shall pay the fee specified in Subsection (e) no later than January 24, 2020 along with additional information as the Department may require including certification of continued eligibility. An Additionally Qualified Building subject to Subsection 9(A) shall be eligible to convert pursuant to

this Subsection as long as there is fully executed written agreement in which the owners each have an exclusive right of occupancy to individual units in the building to the exclusion of the owners of the other units and 50 percent or more of the units have been occupied continuously by owners of record for no less than six years as of January 24, 2020.

(8)    For applications for conversion pursuant to Subsections (3)-(7) only, a unit that is "occupied continuously" shall be defined as a unit occupied continuously by an owner of record for the six year period without an interruption of occupancy and so long as the applicant owner(s) occupied the subject unit as his/her principal place of residence for no less than one year prior to the time of application.

(A)    Notwithstanding the occupancy requirements set forth above, each building may have one unit where there is an interruption in occupancy for no more than a three month period that is incident to the sale or transfer to a subsequent owner of record who occupied the same unit. For any unit with an interruption of occupancy, the applicant shall provide evidence to establish to the satisfaction of the Department that the period did not exceed three months.

(B)    Notwithstanding the occupancy requirements set forth above, each building may have one unit where there is an interruption in occupancy for no more than a one year period if the sale or transfer to a subsequent owner of record who occupied the same unit was delayed during the term of a bank foreclosure against the former owner's interest in the building related to the subject unit. For any unit with an interruption of occupancy as a result of a foreclosure as described in Subsection (B), the applicant shall provide evidence to establish to the satisfaction of the Department that the period did not exceed one (1) year.

(9)    An "Additionally Qualified Building" within the meaning of this Section is defined as a building in which the initially eligible applicant owners of record have a fully executed written agreement as of April 15, 2013 in which the owners each have an exclusive right of occupancy to individual units in the building to the exclusion of the owners of the other units; provided, however, that said agreement can be amended to include new applicant owner(s) of record as long as the new owner(s) satisfy the requirements of Subsection (8) above. In addition to the requirements listed in this Subsection (8), an Additionally Qualified Building also includes a five or six unit building that: (A) on April 15, 2013, had 50 percent or more of the units in escrow for sale as a tenancy-in-common where each buyer shall have an exclusive right of occupancy to an individual unit in the building to the exclusion of the owners of other units or (B) is subject to the requirements of Section 1396.2 (f) and 50 percent or more of the units have been occupied continuously by owners of record for no less than ten years prior to the date of application as set forth in Subsections (3)-(7).

(10)    In addition to all other provisions of this Section, the applicant(s) must meet the following requirements applicable to Subdivision Code Article 9, Conversions: Sections 1381, 1382, 1383,1386, 1387, 1388, 1389, 1390, 1391(a) and (b), 1392, 1393, 1394, and 1395.  Also, the applicant(s) must certify that to the extent any tenant vacates his or her unit after March 31, 2013 and before recordation of the final parcel or subdivision map, such tenant did so voluntarily or if an eviction or eviction notice occurred it was not pursuant to Administrative Code Sections 37.9(a)(8)-(14). If an eviction has taken placed under 37.9(a)(11) or 37.9(a)(14) then the applicant(s) shall certify that th e original tenant reoccupied the unit after the temporary eviction.

(11)    If the Department finds that a violation of this Section occurred prior to recordation of the final map or final parcel map, the Department shall disapprove the application or subject map. If the Department finds that a violation of this Section occurred after recordation of the final map or parcel map, the Department shall take such actions as are available and within its authority to address the violation.

(c)    **Decisions and Hearing on the Application.**

(1)    The applicant shall obtain a final and effective tentative map or tentative parcel map approval for the condominium subdivision or parcel map within one (1) year of paying the fee specified in Subsection (e).

(2)    No less than twenty (20) days prior to the Department's proposed decision on a tentative map or tentative parcel map, the Department shall publish the addresses of building being considered for approval and post such information on its website. During this time, any interested party may file a written objection to an application and submit information to the Department contesting the eligibility of a building. In addition, the Department may elect to hold a public hearing on said tentative map or tentative parcel map to consider the information presented by the public, other City department, or an applicant. If the Department elects to hold such a hearing it shall post notice of such hearing and provide written notice to the applicant, all tenants of such building, any member of the public who submitted information to the Department, and any interested party who has requested such notice. In the event that an objection to the conversion application is filed in accordance with this Subsection, and based upon all the facts available to the Department, the Department shall approve, conditionally approve, or disapprove an application and state the reasons in support of that decision.

(3)    Any map application subject to a Departmental public hearing on the subdivision or a subdivision appeal shall have the time limit set forth in this Subsection (c)(1) extended for another six (6) months.

(4)   The Director of the Department of Public Works is authorized to waive the time limits set forth in this Subsection (c)(1) as it applies to a particular building due to extenuating or unique circumstances. Such waiver may be granted only after a public hearing and in no case shall the time limit extend beyond two (2) years after submission of the application.

(d)   Should the subdivision application be denied or be rejected as untimely in accordance with the dates specified above, or the tentative subdivision map or tentative parcel map disapproved, the City shall refund the entirety of the applicant's fee specified in Subsection (e).

(e)   The fee amount is $20,000.00 per unit for all buildings that seek to convert under Subsection (b)(1)-(7). Said fee shall be adjusted annually in accordance with the terms of Section 1315 (f). Said fee is reduced for each year the building has participated in the condominium conversion lottery up to and including the 2013 lottery in accordance with the following formula:

(1)   2 years of participation, 20% fee reduction per unit;

(2)   3 years of participation, 40% fee reduction per unit;

(3)   4 years of participation, 60% fee reduction per unit; and

(4)   5 or more years of participation, 80% fee reduction per unit.

(f)   For purposes of Section (e), a building's owner(s) shall get credit only for those years that he or she participated in the lottery even though such building could have qualified for and participated in other condominium conversion lotteries.

(g)   **Life Time Lease for Non-purchasing Tenants.**

(1)   Any application for conversion under this Section shall include a certification under penalty of perjury by the applicants that any non-purchasing tenant(s) in the building has been given a written offer to enter into a life time lease in the form and with the provisions published and prescribed by the Department in consultation with the Rent Board. Such written offer for a life time lease shall be executed by the owners of the building(s) and recorded prior to the time of Final Map or Parcel Map approval. Any life time leases made pursuant hereto shall expire only upon the death or demise of the last such life-tenant residing in the unit or the last surviving member of the life-tenant's household, provided such surviving member is related to the life- tenant by blood, marriage, or domestic partnership, and is either disabled, catastrophically ill, or aged 62 or older at the time of death or demise of any such life-tenant, or at such time as the life-tenant(s) in the unit voluntarily vacates the unit after giving due notice of such intent to vacate.

(2)   (A)   Each lease shall contain a provision allowing the tenant to terminate the lease and vacate the unit upon 30 days' notice and a provision that rent charged during the term of the lease shall not exceed the rent charged at the time of filing of the application for conversion, plus any increases proportionate to the increases in the residential rent component of the "Bay Area Cost of Living Index, U.S. Dept, of Labor," provided that the rental increase provisions of this Section shall be operative only in the absence of other applicable rent increase or arbitration laws.

(B)   The lease also shall state that it shall not alter or abridge the rights or  obligations of the parties in performance of their covenants, including but not limited to the provision of services, payment of rent or the obligations imposed by Sections 1941, 1941.1, 1941.2, 1941.3, and 1941.4 of the California Civil Code and that there shall be no decrease in dwelling unit maintenance or other services historically provided to such units and such life-tenants.

(C)   The lease shall include the following language:

Tenant agrees that this Lease shall be subject and subordinate at all times to (i) all ground leases or underlying leases that may now exist or hereafter be executed affecting the Real Property or any portion thereof; (ii) the lien of any mortgage, deed of trust, assignment of rents and leases or other security instrument (and any advances thereunder) that may now exist or hereafter be executed in any amount for which the Real Property or any portion thereof, any ground leases or underlying leases or Landlord's interest or estate therein, is specified as security; and (iii) all modifications, renewals, supplements, consolidations and replacements thereof, provided in all cases that the mortgagees or beneficiaries named in mortgages or deeds of trust hereafter executed or the assignee of any assignment of rents and leases hereafter executed to recognize the interest and not disturb the possession, use and enjoyment of Tenant under this Lease, and, in the event of foreclosure or default, the lease will continue in full force and effect by operation of San Francisco Administrative Code Chapter 37 , Section 37.9D , and the conditions imposed on each parcel or subdivision map pursuant to Section 1396.4 (g), as long as Tenant is not in default under the terms and conditions of this Lease. Tenant agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, any additional reasonable documents evidencing the priority or subordination of this Lease

with respect to any such ground leases, underlying leases, mortgages, deeds of trust, assignment of rents and leases or other security instruments. Subject to the foregoing, Tenant agrees that Tenant shall be bound by, and required to comply with, the provisions of any assignment of rents and leases with respect to the Building.

(3) The Department shall impose the following tentative map conditions on each parcel and subdivision map subject to this Subsection 1396.4 (g) and require that the conditions be satisfied prior to Final Subdivision Map or Parcel Map approval: (A) the property owner(s) of the building provide a written offer for a life time lease pursuant to this Subsection to the tenant(s) in the building and record such offer against the building's title, (B) at the time the tenant(s) accepts the life time lease offer, and even if such acceptance occurs after map approval, a binding agreement between the tenant(s) and the property owner(s) shall be executed and recorded against the property's title, and (C) a binding agreement between the City and the property owner(s) concerning the requirements of this Subsection be recorded against the property's title. For purposes of this Subsection, the Board of Supervisors delegates authority to the DPW Director, in consultation with the Mayor's Office of Housing, to enter in said agreement on behalf of the City and County of San Francisco.

(4) If the owner(s) of a building subject to the life time lease provisions of this Section 1396.4 (g) enters into any contract or option to sell or transfer any unit that would be subject to the lifetime lease requirements or any interest in any unit in the building that would be subject to the lifetime lease requirements at any time between the initial application and recording of the final subdivision map or parcel map, said contract or option shall be subject to the following conditions: (a) the contract or option shall include written notice that the unit shall be subject to the life time lease requirements of Subdivision Code Section 1396.4 (g), (b) prior to final execution of any such contract or option, the owner(s) shall record a notice of restrictions against the property that specifically identifies the unit potentially subject to the life time lease requirements and specifies the requirements of the life time lease as set forth in Section 1396.4 (g)(1), and (c) the recorded notice of restrictions shall be included as a note on the final subdivision map or parcel map. Prior to approval of a final subdivision map or parcel map, the applicant(s) shall certify under penalty of perjury to the Department that he, she, or they have complied with the terms of this Subsection as it applies to a building. Failure to provide this certification from every current owner of a building shall result in disapproval of the map. The content of the notices and certifications required by this Subsection shall comply with the instructions and procedures developed by the Department.

(h) In recognition of the rental requirements of Section (g), the fee for each unit in which a non-purchasing tenant resides at the time specified in Section (g) who is offered a life time lease and is unrelated by blood, marriage, or domestic partnership to any owner of the building shall be refunded to the subdivider under the following formula:

(1) One unit, 10% fee reduction for such unit;

(2) Two units, 20% fee reduction for each unit;

(3) Three units, 30% fee reduction for each unit.

(i) Upon confirmation of compliance with the rental requirement, DPW or the City department in possession of the fee revenue shall refund the amount specified in Section (h) to the subdivider and have all remaining fee revenues transferred to the Citywide Affordable Housing Fund, established in Administrative Code Section 10.100-49, in the following percentage allocations:

(1) 25% to the Mayor's Office of Housing and Community Development's program for small site acquisition to purchase market rate housing and convert it to affordable housing; and

(2) 75% for the purpose of expanding affordable housing opportunities for low or moderate income households in San Francisco, including, but not limited to, expanding public housing opportunities.

(j) **Waiver or Reduction of Fee Based on Absence of Reasonable Relationship.**

(1) A project applicant of any project subject to the requirements in this Section may appeal to the Board of Supervisors for a reduction, adjustment, or waiver of the requirements based upon the absence of any reasonable relationship or nexus between the impact of development and the amount of the fee charged.

(2) Any appeal of requests under this clause shall be made in writing and filed with the Clerk of the Board no later than 15 days after the date the sponsor is required to pay and has paid to the Treasurer the fee as required in this Section. The appeal shall set forth in detail the factual and legal basis for the claim of waiver, reduction, or adjustment. Upon receipt of the appeal, the Clerk of the Board of Supervisors shall review the appeal in consultation with the City Attorney. If the Clerk of the Board determines that the appeal on its face challenges, on a factual or legal basis, the relationship or nexus between the impact of development and the amount of the fee charged, then the Clerk of the Board shall schedule a hearing under Subsection (3). If the Clerk of the Board in consultation with the City Attorney determines that the appeal on its face does not challenge, on a factual or legal basis, the relationship or nexus, then the Clerk of the Board shall notify the members of the Board of Supervisors within three business days of the Clerk's receipt of the

appeal. If any one member of the Board of Supervisors requests within three business days of the Clerk's notification that the Clerk schedule a hearing on the appeal, then the Clerk shall schedule a hearing under Subsection (3). If no member of the Board requests that the Clerk schedule a hearing, then the Clerk shall inform the appellant and the Department of Public Works, within ten business days from the date of the filing, that the filing does not allege a proper basis for appeal, and shall reject the appeal on behalf of the Board of Supervisors.

(3) If the Clerk of the Board schedules a hearing under this Section, the Board of Supervisors shall consider the appeal at the hearing within 60 days after the filing of the appeal. The appellant shall bear the burden of presenting substantial evidence to support the appeal, including comparable technical information to support appellant's position. If a reduction, adjustment, or waiver is granted, any change of use or scope of the project shall invalidate the waiver, adjustment or reduction of the fee. If the Board grants a reduction, adjustment or waiver, the Clerk of the Board shall promptly transmit the nature and extent of the reduction, adjustment or waiver to the Treasurer and Department of Public Works.

(k) **Deferred Payment Based Upon Limited Means.** A project applicant may apply to the Department of Public Works for a deferral of payment of the fee applied to a specific unit as described in Subsection (e) for the period beginning when the Department receives a complete application until six (6) months after recordation of the final parcel or subdivision map, provided that for the twelve months prior to the date of application, the applicant resided in his or her unit in the subject property as his or her principal place of residence and the applicant's household income was less than 120% of median income of the City and County of San Francisco as determined by the Mayor's Office of Housing. Prior to the final approval of a parcel or subdivision map for any building where an applicant(s) has obtained a fee deferral, the Department shall cause the recordation of a notice of restrictions or other similar document against the title of all owners of the subject property that guarantees payment of the deferred fee at the time set forth in this Subsection.

(l) Buildings that convert pursuant to this Section shall have no effect on the terms and conditions of Section 1341A , 1385A , or 1396 of this Code.

(Added by Ord. 117-13 , File No. 120669, Pass. 6/18/2013; amended by Ord. 65-14 , File No. 131146, App. 5/8/2014, Eff. 6/7/2014; Ord. 75-14 , File No. 140226, App. 5/28/2014, 6/27/2014; Ord. 143-15 , File No. 150568, App. 8/6/2015, Eff. 9/5/2015)

## SEC. 1396.5.  SUSPENSION OF THE LOTTERY PENDING PRODUCTION OF REPLACEMENT UNITS FOR EXPEDITED CONVERSION UNITS.

(a) Within twelve months after issuing tentative or tentative parcel map approval for the last conversion under Section 1396.4 or December 29, 2023, whichever is earlier, the Department shall publish a report stating the total number of units converted under the Expedited Conversion program and every twelve months thereafter until the Expedited Conversion program is completed.

(b) No later than April 15 of each year until the termination of the suspension period, the Mayor's Office of Housing shall publish a report stating the total number of permanently affordable rental housing produced in San Francisco and the "Conversion Replacement Units" produced in the previous calendar year and a cumulative total of such housing produced in preceding years during the tracking period. For purposes of this Subsection, the Mayor's Office of Housing shall have the authority to determine what type and form of housing constitutes permanently affordable rental housing that has been produced.

(c) The Department shall not accept an application for the conversion of residential units under Section 1396 nor conduct a lottery under this Article prior to January 1, 2024. Thereafter, the lottery shall resume upon the earlier of the following: (1) the first February following the Mayor's Office of Housing report pursuant to Subsection (b) showing that the total number of Conversion Replacement Units produced in the City of San Francisco exceeded the total number of units converted as identified in the Department's report prepared pursuant to Subsection (a); or (2) completion of the "Maximum Suspension Period" as defined below.

(d) "Conversion Replacement Units" in any year shall be determined by subtracting 300 from the total number of permanently affordable rental units that the City produced in that year starting on January 1, 2014.

(e) The "Maximum Suspension Period" shall be the number of years calculated by dividing the total number of units approved for conversion under Section 1396.4(b)(1)-(7) (the Expedited Conversion program) divided by 200 and rounded to the nearest whole number with the year 2014 as the starting point. For example, if 2400 units have been converted under Section 1396.4(b)(1)-(7), then the maximum suspension period would be 12 years and expire on December 31, 2025.

(Added by Ord. 117-13 , File No. 120669, Pass. 6/18/2013)

## SEC. 1396A.  LOW AND MODERATE INCOME HOUSING REVIEW.

The availability of low and moderate income housing shall be reviewed every two years by the Department of City Planning and the

results of this review shall be included in the Department of City Planning's "Residence Element Update" which is submitted to the Board of Supervisors.

(Added by Ord. 257-88, App. 6/22/88)

## SEC. 1397.  CERTIFICATION OF EXEMPT CONVERSIONS.

(a)   The conversion of a stock cooperative, as defined in Section 11003.2 of the Business and Professions Code, to a condominium, as defined in Section 783 of the Civil Code, is exempt from the provisions of this Code, including, but not limited to, any annual limitation imposed on the number of conversions to condominiums set forth in Section 1396, upon issuance of a Certificate of Exemption pursuant to this Section, but only if the following requirements are met:

(1)   At least 51 percent of the units in the cooperative were occupied by stockholders of the cooperative on January 1, 1981, or individually owned by stockholders of the cooperative on January 1, 1981. As used in this paragraph a cooperative unit is "individually owned" if and only if the stockholder of such unit owns or partially owns an interest in no more than one unit in the cooperative; and

(2)   No more that 25 percent of the shares of the cooperative were owned by any one person, as defined in Section 17, including an incorporator or director of the cooperative, on January 1, 1981.

(b)   In addition to notice requirements hereafter provided, each tenant of a unit in a stock cooperative that is converting to condominiums shall have the nontransferable right (i) to contract for the purchase of the unit upon the same terms and conditions that such unit will be initially offered to the general public or on terms more favorable to the tenant, which right shall run for a period of not less than 90 days from the date of issuance of the subdivision public report pursuant to Business and Professions Code Section 11018.2 where the building to be converted consists of five or more units, or from the date of issuance of a Certificate of Exemption in the case where the building to be converted consists of four units or less; or (ii) to receive moving expenses, up to a maximum of $1,000, which right shall extend for 120 days from the date of issuance of a Certificate of Exemption; or (iii) to enter into a one-year lease of the unit; or (iv) as to tenants aged 62 years or older or permanently disabled, to enter into a lease under the terms and conditions set forth in Section 1391(c) of this Code.

(c)   Applications for a Certificate of Exemption shall be filed with the Department of Public Works and shall contain the following information, based on a declaration under penalty of perjury executed by the applicant that the information provided is, to the best of the applicant's knowledge, correct:

(1)   A copy of a report of residential record ("3-R Report") obtained from the Bureau of Building Inspection showing the type of building and the number of units;

(2)   The name and mailing address of the occupant of each unit;

(3)   Identification of any occupant who is a tenant; for purposes of this Section, a "tenant" is a person other than a shareholder of the stock cooperative who rents or leases a unit in a stock cooperative;

(4)   Verification under penalty of perjury by each non-tenant occupant of a unit that he or she is one of the share owners of a stock cooperative, along with documentary proof of that status in a form acceptable to the Director.

(5)   Information showing that the applicant meets the requirements for exemption under Section 66412(h)(1) and (2) of the SMA.

(6)   Certification that the applicant has provided written notice to every tenant of (i) the applicant's intent to convert to condominiums; and (ii) the applicant's intent to seek the exemption provided herein; and (iii) the rights afforded tenants of stock cooperatives that convert to condominiums pursuant to this Section. The applicant shall also submit a copy of the notice provided to the tenants and the date that it was so provided.

(7)   Certification that the applicant (i) will give, prior to issuance of the Certificate of Exemption, written notice to each person applying for rental of a unit in the building of the tenant rights described in Subsection (4), which notice shall be given prior to acceptance of any rent or deposit from the prospective tenant; and (ii) will give written notice to all tenants that an application for a public report has been submitted to the Department of Real Estate at least 10 days before its submission where the building to be converted consists of five or more units; and (iii) will not terminate any tenancy because of a conversion or proposed conversion without 180 days' written notice to the tenant. Failure to comply with Subsection (i) of this Section will make the applicant subject to payment to the tenant of moving expenses and rent as provided in Government Code Section 66452.8.

The applicant shall also provide stamped envelopes addressed to the occupant of every unit in the stock cooperative. Such stamped and self-addressed envelopes shall be furnished to the Department of Public Works at the time of the filing of the application for a Certificate of Exemption.

(d)   The Director shall determine whether the applicant has met the requirements for exemption set forth in Section 66412(h)(1) and (2) of the SMA and whether a parcel or final map was approved by the Legislative Body of the City and County of San Francisco. If it is determined that these requirements are not met or that a parcel or final map was so approved, the Director shall deny the application.

(e)   If the Director determines that an application meets all the requirements described in Subsection (c), that officer shall take the following action:

(i)   If the applicant has certified that no tenants reside in any of the units, a notice shall be sent to each occupant of the building setting forth the rights of tenants of stock cooperatives that convert to condominiums and stating that the Department intends to issue the applicant a Certificate of Exemption for conversion to condominiums on the grounds that the applicant meets the requirements of Section 66412(h) of the SMA and that no tenants are occupying any of the units in the building. It shall also state that the Certificate of Exemption will be issued within 30 days if no request is made for a hearing to dispute the validity of that action. Upon receipt of a written request, the Director or a designee shall conduct a hearing, after providing notice to the applicant and all occupants of the units, in order to determine whether the Certificate of Exemption should be issued and whether tenant rights have been provided as required herein. If no request for a hearing is made within 30 days of the mailing of such notice, the Director shall issue the Certificate of Exemption.

(ii)   If the applicant has certified that one or more tenants occupy any unit in the building, the Director shall set a date by which the applicant must comply with the requirements of this Section governing tenant rights, which date shall be not less than 60 days from the date that the applicant notified the tenants of the intent to convert and of the rights afforded to such tenants, and shall provide written notice of that date to the applicant and each occupant of the building.

(f)   On or after the date set by the Director for compliance by the applicant with the requirements regarding tenant rights, the applicant shall provide the Department of Public Works with respect to each tenant one of the following:

(i)   A contract executed by every owner of the building and the tenant giving the tenant the right to purchase the unit on the terms set forth above in Subsection (b)(i); or

(ii)   Written certification by the tenant that the tenant has received money for moving expenses or, in the alternative, a contract between the owner(s) of the building and the tenant in which the owner(s) agree to pay the tenant's moving expenses (which contract may contain a provision that the right to such expenses shall expire after 120 days from the date of issuance of the Certificate of Exemption); or

(iii)   A lease executed between the owner(s) of the building and the tenant for either one year or, as to elderly or disabled tenants, on the terms set forth in Section 1391(c) of this Code; or

(iv)   A statement by the applicant that the tenant has been offered each of the tenant rights set forth in this subsection, but has failed to exercise any of those rights.

In every contract and lease entered into pursuant to this Section, every owner of the building shall expressly waive the right to assert as a defense to any legal action brought by a tenant for violation of the contract or lease the claim that the contract is unenforceable because it was not based on consideration provided by the tenant.

(g)   If the applicant has complied with the requirements of this Section governing tenant rights, the Director shall issue the Certificate of Exemption; provided, however, that if any tenant or occupant of the building disputes the validity of that action on the grounds that tenant rights have not been provided as required herein, the Director of a designee shall conduct a hearing, after providing notice to the applicant and the occupant of each unit, in order to determine whether all such rights have been provided. The Certificate of Exemption shall not be issued unless the Director makes the determination that such rights have been provided.

(h)   All decisions of the director made pursuant to this Section are final administrative determinations.

(i)   A subdivider, having applied for and been granted a Certificate of Exemption under this Section 1397 and Section 66412(h) of SMA may elect to file a parcel or final map for recordation, in which case such parcel or final map shall be filed with the Department of Public Works for the sole purpose of recordation. Unless the subdivider requests approval of such data by the County Surveyor, it shall bear a certificate on the title sheet of the map, signed by the County Surveyor, certifying that this map is filed under provisions of the Certificate of Exemption procedure for the sole purpose of recordation, and that approval of the technical and engineering data shown thereon is not implied. Such parcel or final map shall be signed by all parties having any record title interest in the real property subdivided. If the map is not signed by all of the stockholders, the person or persons signing shall produce evidence satisfactory to the Director that they are authorized to sign on behalf of the stock cooperative.

(j)   A fee of $500 shall be charged for investigating and processing an application for Certificate of Exemption for converting a

stock cooperative consisting of four units or less to condominiums and all other costs incidental thereto.

A fee of $800 shall be charged for investigating and processing an application for Certificate of Exemption for converting a stock cooperative consisting of five units or more to condominiums and all other costs incidental thereto.

(k)   A fee of $200 shall be charged for processing and filing a parcel or final map, excluding any recordation fee charged by the Office of the Recorder; provided, however, that if the subdivider requests approval of the technical and engineering data shown on a parcel or final map, the fee shall be the same as that charged for the processing and filing of a condominium map.

(l)   Fees charged under Subsections (j) and (k) above shall be payable to the Department of Public Works and shall be paid at the time of filing the application for Certificate of Exemption, or at the time of filing the parcel or final map, whichever is applicable. Said fees shall be nonrefundable.

(m)   Funds received under Subsections (j) and (k) above shall be deposited in the Subdivision Fund created by Section 1315(c) of this Code and shall be governed by the provisions specified therein.

(n)   Section 1315(b) of this Code shall be applicable to the payment of fees under Section 1397 of said Code as well.

(Added by Ord. 289-85, App. 6/13/85; amended by Ord. 284-04, File No. 041355, App. 12/14/2004)